**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Grover Stanley MONHOLLAND and**
**Orville Glenn Russell,**
**Defendants-Appellants.**

**Nos. 78–1708, 78–1709.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 18, 1979.

Decided July 11, 1979.

As Modified on Denial of Rehearing
Sept. 28, 1979.

___

**1312**

James E. Edmondson, Asst. U. S. Atty. (Julian K. Fite, U. S. Atty., Muskogee, Okl., on brief), for plaintiff-appellee.

Harold Landram, Muskogee, Okl., for defendant-appellant Grover Stanley Monholland.

Jesse L. Leeds, Muskogee, Okl., for defendant-appellant Orville Glenn Russell.

Before McWILLIAMS, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

On June 19, 1978, the above-named defendants were jointly indicted by a grand jury in the Eastern District of Oklahoma. The indictment had four counts. Count I charged that on April 1, 1978, and continuing to May 23, 1978, the defendants willfully and knowingly entered into an agreement, combination and conspiracy to commit the offense of willfully and maliciously destroying a vehicle by explosives, a pickup truck, the property of State District Judge Lynn Burris of Cherokee County, Oklahoma, which vehicle was used regularly as part of an activity affecting interstate commerce, contrary to 18 U.S.C. § 844(i) and 18 U.S.C. § 2. It was further alleged that the object of the conspiracy was to destroy the truck when Judge Burris was operating it, thereby causing his death.

The overt acts in connection with Count I are that the defendants hired a person to do the actual bombing. On May 22, the date of the hiring, the defendants took this person to the residence of Judge Burris and pointed out the pickup truck and said that enough explosives should be used to destroy the vehicle and kill the judge. An additional overt act was entering into a contract, with the individual employed, to pay him $1,000 for killing Judge Burris. A further overt act alleged was that on May 23, 1978, defendant Russell gave the individual employed $20.00 as expense money for a down payment on the $1,000.00.

Count II charged that on May 23, the defendants willfully and knowingly attempted to damage and destroy, by means of an explosive, a vehicle, a pickup truck of Judge Burris, which vehicle was regularly used in an activity affecting interstate commerce.

Counts III and IV were the same except that they were separate counts as to Russell and Monholland. Count III alleged that on

the 22nd of May, Russell attempted to receive in interstate commerce an explosive, defined in 18 U.S.C. § 844(j), with knowledge that the explosive would be used to kill the judge, in violation of 18 U.S.C. § 844(d).

Count IV, with the same language as that in Count III, charged Monholland with the act of attempting to receive explosives in interstate commerce.

This case originated with the Bureau of Alcohol, Tobacco and Firearms, which agency received information that the defendants were trying to purchase a case of dynamite, dynamite caps and primacord. On May 22, 1978, an agent of the Bureau, one Loyd S. Cobb, contacted the defendant Monholland for the purpose of buying a pickup truck, supposedly, and was advised by Cobb that he was a blaster for an area construction company. On learning that Cobb was supposedly connected with explosives, Monholland asked him whether he was completely honest and was told that he (Cobb) would do whatever was necessary in order to earn money, whereupon Monholland said that he might have some work for Cobb to do. Cobb inquired as to its nature and was told that the target was a district judge. Cobb did not quote a price at that time. Monholland and Cobb drove to the residence of defendant Russell. Monholland talked to Russell and the two of them talked to Cobb about killing two district judges. He then told Cobb that he wanted him to look at a pickup truck. Russell led them to the residence of Judge Burris and they pointed out the judge's pickup. Russell indicated at that time that it was his wish to have the pickup truck blown up.

On this occasion Cobb stated that his fee for each of the contracts would be $1,000.00. He also showed the defendants simulated dynamite. They asked how much the dynamite was and Cobb answered that it was not for sale. Monholland stated that the contract fee would be paid to Cobb after the job was completed. He also said that he might have the money the next night. Russell agreed to this and they said that they might have two more jobs for Cobb to

do at the same time. The defendants said that in addition to blowing up Judge Burris's pickup truck, they wanted to be sure that the judge was killed in connection with it. All three returned to Russell's residence and the defendants then invited Cobb to return the next day at which time they would possibly have the money and further jobs for him to do.

The three met again on May 23, 1978, at which time Monholland said that he was trying to get the money and that meanwhile Cobb could have a rifle as a bonus if he would wait. Russell said that he did not have the money on hand and would have to borrow it or rustle some cattle to get it. Both Russell and Monholland gave Cobb a $20.00 bill for gasoline money on account. Cobb agreed to hold the money. Following this May 23 conversation, Monholland and Russell were arrested by the Bureau of Alcohol, Tobacco and Firearms, and after that they were indicted by the grand jury on the charges that are the subject of the appeal. At trial the evidence showed that each of the two defendants had personally inspected and handled the "dynamite."

Thankfully, this matter failed to materialize in any significant way. When it reached the payment of money stage, it lost all momentum. So the conspiracy and attempt did not proceed beyond extensive conversations.

The points advanced by the defendants are:

*First,* that the court erred in admitting tape recordings of conversations by the agent with the defendant because of their lacking evidentiary foundation; also, that the tapes were inaudible; thirdly, that there had been no opportunity to examine them before trial; and, fourthly, that they were not admissible because they were made without the defendants' consent.

*Second,* that the venue was improper because of the excessive newspaper coverage that was given to the case.

*Third,* that there was no proof of jurisdiction because the transaction was intrastate.

*Fourth,* that even though entrapment was not interposed at the trial, it could be relied on as an issue of law on this appeal.

We conclude that the transaction is not one which has any effect on interstate commerce, and therefore there was a lack of federal jurisdiction.

## THE JURISDICTION QUESTION

■ The section of the statute under which the prosecution was undertaken, 18 U.S.C. § 844(i), provides as follows:

(i) whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

Thus, it proscribes the damaging or attempting to damage or destroy "by means of an explosive, any building, vehicle * * used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce * * *." The statute therefore focuses primarily on property. The effect of personal injury is an aggravating factor which substantially increases the penalty which can be imposed. The indictment centers on the conspiracy to blow up the vehicle.

The government's theory of the case is that the vehicle was used in interstate commerce or in an activity affecting interstate commerce. The indictment describes the judge's pickup as a vehicle which is regularly used in and as a part of activity affecting interstate commerce. The statute does not go that far and it cannot be expanded. The prohibition of the statute is against use of explosives to damage or destroy a vehicle used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.

The evidence shows that Judge Burris, an Oklahoma state judge, serves a five-county judicial district and that he drives his pickup truck between his residence and the courthouse within his judicial district and within Oklahoma. He does not, of course, drive the truck interstate. There is not even the pretense that he does. The government argues in its brief, however, that it met its burden of establishing the required connection between interstate commerce at least to a *de minimis* extent. It also relies on the fact that the simulated explosive, a dummy stick of "dynamite" which was viewed by Russell and Monholland, had traveled in commerce. These simulated explosives were not, of course, explosives at all. We do not say that this fact is of any great consequence because the prosecution is not based on the interstate character of the explosives, simulated or real. It zeros in on the interstate character of the *vehicle.* The prosecution argues that Judge Burris testified about "numerous" aspects of his job as a judge which affected interstate commerce and about the use of that particular pickup truck and its contribution to these activities. This needs careful attention.

Judge Burris testified that in the course of his duties he customarily presides over divorce cases; cases involving enforcement of support orders under the Uniform Reciprocal Support Act; cases involving child custody, alimony and property divisions; cases in which parties and interests in other states are present; problems connected with fugitives and flight warrants; possession of stolen property, particularly automobiles, which have originated in other states; and also, traffic offenses in which the cars have come from other states. He testified that he traveled around the district holding court in his 1969 Ford pickup which was the object of the conspiracy described in the indictment. He further said that in traveling within the five-county jurisdiction, he used the United States highway system. His further testimony was that five days a

week he drove back and forth from his home to the local courthouse in the town of Tahlequah, where he lived, and that one or two days a month he traveled to other counties in order to hold court.

So, the question which we address is whether the handling of cases dealing with parties from other states causes the pickup truck in question (which was used to drive from home to court) to be used in interstate or in foreign commerce or any activity affecting interstate or foreign commerce. We conclude that this judicial activity does not cause the truck to affect commerce.

 The history of 18 U.S.C. § 844(i) indicates that the commerce requirement contained therein is to be broadly construed. H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 4007, 4046–47, provides:

> Section 844(i) proscribes the malicious damaging or destroying, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. Attempts would also be covered. Since the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Corp.,* 83 S.Ct. 312, 371 U.S. 224, 226, 9 L.Ed.2d 279 (1963), this is a very broad provision covering substantially all business property. While this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress authority to regulate and to protect interstate and foreign commerce. Numerous other Federal statutes use similar language and have been constitutionally sustained in the courts. [Citations omitted].

Although it is broad, it is not limitless and must bear some real relationship to commerce. The Congressional Committee Report said that notwithstanding the broadness, it was a permissible exercise of the congressional authority to regulate and to protect interstate and foreign commerce.

This court has said that the effect on interstate commerce may be *de minimis* in *United States v. Schwanke,* 598 F.2d 575 (10th Cir. 1979). The defendant there contended that the commerce element was not satisfied because he was not a person engaged in organized crime. The evidence, however, showed that the building destroyed included a cafe which purchased supplies in interstate commerce. The court, through Judge Barrett, said:

> Congress has the power to punish the unlawful use of explosives under the Commerce Clause even though the effect on interstate commerce may be *de minimis. United States v. Sweet,* 548 F.2d 198 (7th Cir. 1977), *cert. denied,* 430 U.S. 969, [97 S.Ct. 1653, 52 L.Ed.2d 361] (1977). In *Sweet, supra,* the court quoted extensively from the legislative history of § 844(i)
> · · ··

*Id.* at 578. In the *Sweet* case, cited in *United States v. Schwanke, supra,* the jury instruction required that the specific commerce facts be established beyond a reasonable doubt. It was held that this was proper, but that the commerce requirement was satisfied where one local tavern owner used explosives to destroy a local competitor's tavern.

Other cases have held that the destruction of business property satisfies the commerce element of § 844(i), where it was shown that the business, that had used the destroyed building, received goods from out of state and had goods in the building at the time of the blast which were destined for sale in interstate commerce. *United States v. Nashawaty,* 571 F.2d 71, 75 (1st Cir. 1978). The government was not required to prove that the products present in the shop, at the time the blast took place, had originated out of state. *Id.*

In *United States v. Keen,* 508 F.2d 986, 990 (9th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975), there was evidence of an effect on interstate commerce based on the fact that the boat which exploded was used in commercial shipping and that the product, the catch of fish, was shipped in interstate commerce.

Thus, where a building or facility is used in a business at the time that it is destroyed, the facts frequently are held to fulfill the interstate commerce requirement of the statute, but a building lends itself to this finding more readily than does a vehicle.

We have examined *United States v. Kaplan,* 588 F.2d 71 (4th Cir. 1978), and *United States v. Whitson,* 587 F.2d 948 (9th Cir. 1978), prosecutions under § 844(i), *supra.* In one instance the defendant was convicted for the bombing of an automobile in the course of a lover's quarrel. In *Whitson,* defendant blew up his own vehicle in an effort to create the belief that he had been killed. The commerce issue was not raised or weighed in either case.

The difficulty with the evidence in the case at bar is that it is very sketchy. The ultimate dependence is on the fact that a judge has handled various kinds of cases which involve parties who have come to Oklahoma in order to litigate. Such immigration may in some instances affect commerce, but this fact does not necessarily show such an effect. The vehicle in question was not even used on official business. It was used to transfer the judge to and from work. The important problem here is that movement to and from work is an activity which ordinarily has an existence independent from the work. It does not blend into and become a part of the career. If a connection is to be established between the vehicle and the work, it must be shown that there exists a nexus between the two activities. Here the activities are independent.

The evidence here is that the function of the truck is to get the judge back and forth, and if the truck fails he would find some other means to accomplish the trip. We say, then, that the truck is wholly immaterial as far as any commerce is concerned even if we assume that there is a commerce quality about what the judge does after he gets to court. It is not at all clear that what he does even resembles commerce. Accordingly, it is impossible to say that the truck affects commerce. Since it is divorced from the activity carried on in court,

there is no legal relationship whereby one can say that the truck affects commerce. To so hold is to recognize as interstate commerce something less than what is *de minimis.* Our view has to be that, in law, the activity of the judge at the courthouse is remote from the use of the truck. The truck does not enter into the administration of justice in the slightest degree.

■ Finally, there is no indication in the statute that Congress, although it intended to have the statute broadly construed, intended that everybody and everything should be included. To so hold or to so construe the statute is to stretch the concept beyond its limit. Neither the district attorney nor the trial court can confer jurisdiction on the court where it does not exist. No doubt this incident and the prosecution stirred strong feelings in the community and general area. This, however, must not affect the decision of this court. If we are to perform judiciously, we must penetrate these factual problems and apply the law given to us by the Constitution and by the Congress, regardless of the policy factors which exist within a community. We must be aware continuously that a federal court is a court of limited jurisdiction. The state court, on the other hand, is not so limited. If jurisdiction is not shown to exist in federal court, the case necessarily fails and that situation is present here.

In view of the jurisdictional deficiency, we are powerless to take any action except reversal with directions to dismiss the case.

IT IS SO ORDERED.

### ON REHEARING

In their motion for rehearing the government contends that even if one concedes that the vehicle was the principal object of the alleged conspiracy, and assuming that, as a result, there is a lack of showing that it traveled in interstate commerce, that this applies to Counts I and II only; that Counts III and IV are based upon an attempt, pursuant to 18 U.S.C. § 844(d), to receive in interstate commerce an explosive, that is, some type of high explosive or blasting

materials, as defined in 18 U.S.C. § 844(j), with the knowledge and intent that said explosives would be used to kill an Oklahoma State Associate District Judge.

We note that Counts III and IV of the indictment specify the willful and knowing attempt to receive in interstate commerce an explosive, that is, some type of high explosive or blasting materials, as defined in 18 U.S.C. § 844(j). The evidence relied on to establish this was a conversation which Cobb said that he had first with Monholland in which he was asked by the district attorney whether or not an offer was made to him to purchase explosives by either or both of the defendants. Cobb said "Yes." He then described the offer of Monholland asking a question of Cobb, "What would a box—words to the effect what would a box of that stuff, caps, and dynamiting cord cost, or what would I sell it to him for." Cobb was further asked whether Monholland was viewing the stick of simulated dynamite at the time, and he said "Yes."

The testimony as to Russell was similar but distinct. Cobb was asked whether Russell made such an offer, and he replied "At his residence that night when Mr. Monholland and I went to Mr. Russell's residence, Mr. Russell asked what would I take for it." The reference here was to the stick of simulated dynamite. Cobb answered that he didn't sell it; that he did all of the work himself. He said also that he had made this response to Monholland. This is the extent of the available testimony to prove that an attempt was made to receive in interstate commerce explosives, that is, high explosives or blasting materials looking to blowing up the truck and killing the judge.

The statute now being considered looks to the receiving in commerce of genuine high explosives or blasting materials to be used for killing or injuring a person or damaging or destroying a vehicle or building. One problem is that the evidence does not disclose anything approximating actual explosives or blasting materials. True, there is some talk between Agent Cobb, who conducted all of the dealings with the defend-

ants, and on one occasion one of the defendants held a piece of simulated dynamite which Cobb provided. Both of the defendants asked questions about the purchase of it.

■ Our reaction is that this was nothing more than preliminary discussion which falls short of the requisite attempt to transport or receive in commerce an explosive. If the activity had proceeded to a further length, that is, if a tangible act which constituted proximate and tangible evidence of a real effort had emerged, the government's position would be more tenable. Complete absence of any such evidence supporting Counts III and IV renders it as weak as that which was relied on to support Counts I and II.

When the text of the statutes is carefully scrutinized the deficiency in the evidence becomes clear.

Subsection (d) of § 844, *supra*, provides in part:

> Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, * * *

Subsection (d) thus calls for transporting or receiving or *attempting* to transport or receive in commerce any explosive with knowledge that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property. The gist of the offense is therefore to receive or to attempt to transport or receive in commerce. The inapplicability of the statute to the facts of this case is shown, first, by the remoteness from the ultimate crime of the alleged attempt. All that you have here is the evidence quoted above that the stick of simulated dynamite was held by one of the defendants and seen by the other and an inquiry about whether or not it could be sold. This is a far cry from transporting or receiving or attempting to trans-

port or receive in commerce any explosive with knowledge that it will be used to kill or destroy. How can this showing, consisting as it does of mere abstract talk, serve to evidence the crime of attempt to transport or receive in interstate commerce an explosive with knowledge or intent that it will be used to kill, injure or intimidate an individual.

Subsection (j) defines the term "explosive" in relationship to subsection (d) above. It declares that

the term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

The argument is that the simulated dynamite was brought along as a symbol or sample and that the object does not make a case of attempt because it underlines the preliminary character of these discussions; they show nothing more than preparatory discussion.

The element which is lacking is some overt act which points directly to the object offense.

■ The cases universally hold that mere intention to commit a specified crime does not amount to an attempt. It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime. *See* 21 Am.Jur.2d § 111. The author, after stating the above rule, adds "However, not every act that may be done with intent to produce an unlawful result is

unlawful or constitutes an attempt; it is a question of proximity and degree." Thus, the courts examine the overt act to determine whether it is closely connected with the crime which is the object of the attempt. The author continues:

According to many authorities, mere acts of preparation, not proximately leading to the consummation of the intended crime, will not suffice to establish an attempt to commit it, especially when made at a distance from the place where the substantive offense is to be committed, for there must be some act moving directly toward the commission of the offense after the preparations are made. 21 Am.Jr.2d § 111.

A commentary in Annot., 98 A.L.R. 913, 918 (1935), entitled *What conduct amounts to an overt act or act done toward commission of murder so as to sustain charge of attempt to murder,* is a note following the decision of the Supreme Court in *People v. Miller,* 2 Cal.2d 527, 42 P.2d 308 (1935), in which attempted murder was charged. The accused in *Miller* was convicted of an attempt to commit murder based on evidence that while somewhat under the influence of liquor, he threatened to kill another. He entered a field where such other was at work with a third person, carrying a .22-caliber rifle, walked toward both, and when some distance from them stopped and appeared to be loading the rifle, and, without raising it to take aim or pursuing the threatened person who fled, continued towards the third person to whom he surrendered the rifle without resistance.

The Supreme Court of California ruled that the acts of the defendant did not constitute attempt to commit murder. Although conceding that it was a close case, it was emphasized that there must be a specific intent to commit the crime and, secondly, a direct ineffectual act done toward its commission. Mere intention to commit a specified crime, the court said, did not amount to an attempt; preparation alone was not sufficient. "Something more is required than mere menaces, preparation, or planning." 30 Cor.Jur. 13. The California court added that preparation involved devising or arranging the means or meas-

ures necessary for the commission of the offense. In contrast, the attempt, it was said, is the direct movement towards the commission after the preparations are made. The court further said that the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It said that some appreciable fragment of the crime must have been committed. It must have progressed to a point where it will be consummated unless interrupted. In effect, the court was saying that the act must have passed the preparation stage so that if it is not interrupted extraneously, it will result in a crime. Unless it satisfies these elements, it is not per se indictable as an attempt.

Numerous cases showing the difference between preparation and an unequivocal act directed to the commission itself which would constitute an attempt are contained in the cited Annotation. Many cases are cited showing acts which sufficiently constitute an overt act. Others cited and discussed illustrate when an act or conduct is insufficient to establish an overt act directly connected with the commission of the crime.

An early English case which appears in the Annotation carries the doctrine just mentioned to its outer limits. This was *Reg. v. Williams* (1844) 1 Car. & K. 589, 174 Eng.Reprint, 950, 1 Den.C.C. 39, 169 Eng. Reprint, 141. It was there held that the delivery of poison to an agent, with direction to him to cause it to be administered to another, under such circumstances that, if administered, the agent would be the sole principal felon, did not constitute an attempt to administer within the meaning of the statute, for if the agent had administered the poison, he would have been the sole principal felon, and the accused would have been an accessory before the fact. Under our law, of course, a different result would likely be reached under the facts in this case because an accessory before the fact is a principal. Nonetheless, this English case dramatizes the need for an overt act and attests to its considerable history.

Many of the cases considered in the note are early ones, but there is no indication that the rule requiring a proximate overt act has been relaxed in the recent decisions.

The kind of overt act which is sufficient in this kind of case is illustrated in the often-cited decision in *United States v. Bowen* (1835; D.C.) 4 Cranch, C.C. 604, 24 Fed.Cas.No. 14,629. The defendant, a slave, was guilty of an attempt to murder where he entered the room of his mistress with an ax and was prevented from carrying out his object by the awakening of the mistress and her servant, whereupon he was seized and forced out of the room.

In *State v. Mitchell* (1902) 170 Mo. 633, 71 S.W. 175, 94 Am.St.Rep. 763, the defendant went to the window of a room with a loaded revolver believing that the person he wished to kill was in that room. He fired at the place where he thought the person was. He was held to be guilty of an attempt.

*State v. Frey* (1922) 92 W.Va. 323, 114 S.E. 681, held that where the defendant fired a shot from a pistol in the general direction of persons who were approaching, evidence was insufficient to sustain a guilty verdict of an attempted murder of one of the group.

More recent federal cases apply virtually the same standards to attempt cases. One of the best of these opinions is that which was written by Judge Rives in *United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). Defendant there was convicted of attempted distribution of heroin. In that case a policeman, after extensive preliminary negotiations and efforts, contacted the defendant and paid him $650.00, which money was to have been used by Mandujano, the defendant, to go out and purchase heroin. The agent waited while the defendant made the effort. Later he returned and said that he was unable to locate his contact. He returned the money to the officer.

The Fifth Circuit held that the evidence was sufficient. In discussing the overt act element the court said:

* * * the defendant must have engaged in conduct which constitutes a substantial step toward commission of the

crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent. 499 F.2d at 376.

The court went on to summarize virtually all of the federal cases on the subject, and although some of them stated the requirement of overt act in somewhat different terms, the standard in most instances was virtually the same as that expressed and applied by the court in this case. *See* 499 F.2d at 376–77.

It is to be concluded, then, that while intent is an essential element, it is not sufficient to constitute the offense. There must be an overt act pointed directly to the commission of the crime charged. At bar, the evidence is plainly insufficient to satisfy this requirement. All that we find here is general conversation. There is no act on the part of the defendants that can be regarded as directly aimed toward the commission of the offense and which is proximate and germane thereto.

Accordingly, we must hold that, in view of the deficiencies which are mentioned, the court's action in submitting the case to the jury constituted error and requires reversal. It is therefore ordered that the case be reversed and remanded with directions to dismiss the charges.