**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John R. BUNNEY, Defendant-Appellant.**

No. 81–2343

United States Court of Appeals,
Tenth Circuit.

April 12, 1983.

Richard Honaker, Rock Springs, Wyo. (Frank R. Chapman, Casper, Wyo., with him on the brief), for defendant-appellant.

Francis Leland Pico, Asst. U.S. Atty., Cheyenne, Wyo. (Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., and Christine Chute, Legal Intern, with him on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, and BREITENSTEIN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

John R. Bunney was convicted by a jury of three counts of attempting to maliciously damage and destroy buildings by means of an explosive in violation of 18 U.S.C. § 844(i) (1976).[1] On appeal he contends that: (1) the trial court lacked jurisdiction over the offenses charged because uncontained gasoline is not an "explosive" as defined in the statute;[2] and (2) the evidence was insufficient to convict him of an attempt to destroy any of the three buildings. We affirm in part and reverse in part.

Bunney owned the Forty-Niner Bar in Wheatland, Wyoming. In March 1981, he began discussing methods of burning down the Forty-Niner with Darrel Jerome. They formulated plans in a series of conversations during late March and early April. In order to avoid raising the suspicion that Bunney had destroyed his bar for the insurance money, they planned to destroy two other bars in the area, the Rompoon Saloon and the Wheatland Country Club. Jerome was to destroy all three bars by using gasoline. They decided to burn the Rompoon by pouring a gallon of gasoline on the bar top and setting it on fire. They planned to set two fires in the Forty-Niner, one on the main floor and one in the basement where a propane tank was located. Although he did not discuss it with Bunney, Jerome planned to bomb the Wheatland Country Club with a Molotov Cocktail.

1.  18 U.S.C. § 844(i) (1976) provides:
    "(i) Whoever maliciously damages or destroys or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title."

2.  18 U.S.C. § 844(j) (1976) provides:
    "(j) For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section, the term 'explosive' means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture or device or any part thereof may cause an explosion." 18 U.S.C. § 232(5) (1976) provides:
    "(5) The term 'explosive or incendiary device' means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone."

Another measure designed to deflect suspicion was a plan to sell the Forty-Niner to Jerome shortly before it was to be destroyed. Accordingly, Bunney and Jerome visited Bunney's insurance agent, and Bunney asked him to research the costs of increasing coverage in connection with the sale. Later, on April 8, Bunney telephoned the insurance agent and again discussed the coverage and the planned sale to Jerome.

Bunney agreed to pay Jerome $50,000 for his part in the destruction of the three bars. If Jerome bought the bar, Bunney would buy back the bar's liquor license for that amount after the fire. Otherwise, Bunney would pay Jerome with some of the insurance proceeds.

Early in April 1981, Jerome changed his mind about destroying the bars and contacted the County Attorney of Platte County, who in turn contacted the State of Wyoming and the Bureau of Alcohol, Tobacco, and Firearms. Jerome agreed to wear a small transmitter so that the federal agents could record his conversations with Bunney. Agents recorded four such conversations.

During one of the conversations, Jerome and Bunney walked through the Forty-Niner, discussing in detail how a fire would spread. They estimated the costs of rebuilding and replacing furniture "if, by some chance, [Jerome] was to make a mistake and not totally burn the place down." Rec., vol. VIII, at 152.

Bunney and Jerome planned to first destroy the Rompoon Saloon. They drove there and Bunney looked at the back door that Jerome was supposed to kick in to gain entry to the bar. On Friday, April 10, they agreed that Jerome would leave his home shortly before 3:30 a.m. on April 11, walk to the Rompoon Saloon, pour out a gallon of gasoline, and ignite it with a delay device of a lighted cigarette wrapped in a book of matches. He would then walk to Interstate 25. Meanwhile, Bunney would have left the Forty-Niner at 3:22 a.m. in order to meet Jerome when he got to the highway. They synchronized their watches.

Jerome did not go to the Rompoon Saloon. Instead a federal agent gave him a ride to the place where he was supposed to meet Bunney. Bunney arrived as planned. He told Jerome to "get rid of" the socks he was supposed to have worn over his shoes to eliminate footprints at the Rompoon Saloon. Bunney took Jerome home and returned to the Forty-Niner. A federal agent later found two socks along the highway shoulder. Bunney was arrested that day.

## I.

## JURISDICTION

Bunney argues that gasoline poured in a room and ignited by a cigarette or matches is not an "explosive" as defined in 18 U.S.C. § 844(j) (1976).[3] The circuits are split on how broadly to construe the statutory definition of "explosive." The Seventh and Eighth Circuits have construed the statute broadly. See *United States v. Agrillo-Ladlad,* 675 F.2d 905 (7th Cir.) (naphtha-soaked newspapers), *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Hepp,* 656 F.2d 350 (8th Cir.1981) (uncontained methane gas). On the other hand, the Second and Ninth Circuits, and one district court, have interpreted it more narrowly. *United States v. Gelb,* 700 F.2d 875 (2d Cir.1983) (uncontained gasoline); *United States v. DeLuca,* 692 F.2d 1277 (9th Cir.1982) (uncontained gasoline); *United States v. Birchfield,* 486 F.Supp. 137 (M.D. Tenn.1980) (uncontained gasoline). However, the Ninth Circuit has stated that it would construe the statute to include uncontained gasoline were it not constrained by circuit precedent. *DeLuca,* 692 F.2d at 1280. The Eleventh Circuit has reserved the question of whether gasoline satisfies the definition of "explosive" in section 844(j). *United States v. Hewitt,* 663 F.2d 1381, 1390 n. 16 (11th Cir.1981).

▮ Our disposition of this issue is governed by *United States v. Poulos,* 667 F.2d 939 (10th Cir.1982), in which we held that "gasoline, when used in an attempt to destroy or damage property in these circumstances does come within the definition of

---

**3.** See note 2.

explosive in section 844(j)." *Id.* at 942. Bunney urges that we distinguish *Poulos* because in that case witnesses testified as to an actual explosion whereas here witnesses could only speculate as to the possibility of an explosion. He also seeks to limit the holding to cases where the expert witnesses who testify agree that gasoline can be an explosive. We decline to read *Poulos* so narrowly. We note with the Ninth Circuit that "[w]e shall not face this problem again. Congress has amended 18 U.S.C. § 844 to include arson by fire (in addition to explosive) within its provisions. Anti-Arson Act of October 12, 1982, Pub.L. No. 97–298." *DeLuca,* 692 F.2d at 1280–81.

## II.

### SUFFICIENCY OF THE EVIDENCE

Bunney argues that the evidence was insufficient to convict him because his alleged attempts to destroy the three buildings amounted to no more than a series of conversations, i.e., mere planning and preparation.

"[M]ere intention to commit a specified crime does not amount to an attempt. It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime."

*United States v. Monholland,* 607 F.2d 1311, 1318 (10th Cir.1979). The issue before us, therefore, is whether Bunney's actions constituted the requisite "overt act," *id.,* or "substantial step" toward the commission of the crime. "A substantial step must be strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

The defendants in *Monholland* were charged under 18 U.S.C. § 844(d) (1976) with attempting to receive in interstate commerce an explosive with the knowledge or intent that it would be used to kill a person. We held that the charges should have been dismissed because the alleged attempt was too remote from the ultimate crime and was "mere abstract talk." *Monholland,* 607 F.2d at 1318.

"All that you have here is the evidence ... that the stick of simulated dynamite was held by one of the defendants and seen by the other and an inquiry about whether or not it could be sold."

*Id.* at 1317.

Bunney argues that he did no more. With respect to the Forty-Niner and the Rompoon Saloon, we disagree. His conversations with Jerome were much more specific and directed to the attempted offense than was the defendants' inquiry in *Monholland* about whether dynamite was for sale. As discussed above, Bunney and Jerome had a series of detailed discussions planning the destruction of the two bars. Bunney took Jerome to the Forty-Niner and discussed how best to destroy the building. Bunney and Jerome visited Bunney's insurance agent to inquire about increased coverage, representing that Jerome was going to buy the Forty-Niner. Bunney and Jerome drove to the Rompoon Saloon together and Bunney looked at the door by which Jerome was to enter. They carefully planned Jerome's destruction of the building, synchronizing their watches so that Bunney could meet Jerome on the highway when he had completed his task.

These facts are highly analogous to those in *United States v. Brown,* 604 F.2d 347 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980). Like Bunney, Brown was charged with attempting to destroy a building in violation of section 844(i). He argued that the five meetings and four telephone conversations he had with two undercover agents of the Bureau of Alcohol, Tobacco, and Firearms constituted "nothing more than mere preparation and that preparation is not an attempt." *Id.* at 349. The Fifth Circuit rejected that argument. "[T]he evidence shows that Brown (1) made a firm agreement with [one of the agents] for acquisition of the explosives needed to blow up the store and (2) dispatched [both agents] to reconnoiter and inspect the building in preparation for its destruction." *Id.* at 350. Each of those acts was held to be a "substantial step." *Id.*

382

We follow *Brown* here and hold that Bunney's actions with respect to the Forty-Niner and the Rompoon Saloon constituted a substantial step toward commission of the crime of destroying each building by means of an explosive.[4] Bunney had completed his participation in the destruction of the Rompoon Saloon; he would have done no more had Jerome actually carried out the plan. Furthermore, he took substantial steps toward destruction of the Forty-Niner. Under these circumstances, we believe Bunney attempted to destroy the two buildings by explosives within the meaning of section 844(i). *Cf. United States v. Conway,* 507 F.2d 1047, 1050 (5th Cir.1975) (impossibility not a defense to attempt to maliciously destroy building by means of explosives simply because there were no explosives where defendant hired others to do the bombing, showed them motion picture of building, and paid them).

Affirmed as to Counts I and III; reversed as to Count II.

---

**4.** Count I of the indictment charged Bunney with attempting to destroy the Rompoon Saloon, Count II the Wheatland Country Club, and Count III the Forty-Niner. We conclude that the Government failed to prove that Bun- ney took a substantial step toward destroying the Country Club. He and Jerome neither visited the Country Club nor made concrete plans for its destruction. Accordingly, we affirm only the convictions on Counts I and III.