UNITED STATES of America, Appellee,

v.

Schabin JONSSON, also known as Doc Jonsson, also known as Schabin Akaberian, Appellant.

No. 93–1531.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 19, 1993.

Decided Feb. 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 22, 1994.

Bruce C. Houdek, Kansas City, MO, argued, for appellant.

Bruce E. Clark, Kansas City, MO, argued (Michael A. Jones and Bruce E. Clark, on the brief), for appellee.

Before BOWMAN, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

BEAM, Circuit Judge.

A jury convicted Schabin Jonsson of attempting to obtain an explosive device in violation of 18 U.S.C. § 844(d). He later pleaded guilty to a separate charge of conspiring to distribute at least five kilograms of cocaine.[1] The district court[2] sentenced Jonsson to a term of 292 months (24 years, 4 months) imprisonment on both counts. Jonsson challenges his attempt conviction arguing that there was insufficient evidence to establish that he took a substantial step toward obtaining an explosive device. Jonsson also contends that the district court clearly erred in its sentencing calculation of the quantity of cocaine involved in the conspiracy. We affirm both Jonsson's conviction and his sentence.

---

1. These separate offenses were originally charged in a single indictment, but the district court severed them for trial.

2. The Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri.

## I. EXPLOSIVE DEVICE

■ We review the evidence on Jonsson's sufficiency of the evidence challenge in the light most favorable to the jury's verdict. *See United States v. LaChapelle,* 969 F.2d 632, 633 n. 1 (8th Cir.1992). The government's evidence at trial consisted primarily of several audiotapes and videotapes of meetings and phone conversations between Jonsson and undercover investigators. The evidence shows that in June of 1991, Mary Knapp, a Jonsson employee and confidential government informant, introduced Jonsson to Brian Jamison, an undercover Missouri State Highway Patrol trooper, at her apartment. Trooper Jamison presented himself as a friend of Knapp's and the middleman for an illegal arms merchant, played by Special Agent Mark James of the Bureau of Alcohol, Tobacco and Firearms (ATF).

Trooper Jamison indicated at his first meeting with Jonsson that his contact would sell anything Jonsson wanted, including handguns, silencers, automatic weapons, and plastic explosives. Jonsson expressed a particular interest in .22 caliber handguns or rifles with silencers. He also discussed possible uses for plastic explosives at some length, including placing explosives in a furnace to blow up a house. Trooper Jamison concluded the meeting by agreeing to ascertain the prices of the various weapons from his weapons source.

Jonsson met with Trooper Jamison in Knapp's apartment again on July 2, 1991. At this meeting Trooper Jamison read Jonsson a list of prices for weapons including .22 caliber pistols with silencers, automatic machine guns, military grenades, plastic explosives, detonators, and a military rocket launcher. Trooper Jamison indicated that his source could obtain other weapons for sale as necessary. Jonsson questioned Trooper Jamison about each item on the list and repeated the prices to make sure that he understood correctly. At the end of the

meeting, Jonsson asked for an address where he could contact Trooper Jamison's weapons source directly.

On July 23, 1991, Trooper Jamison took Jonsson to Rosencrans Airport in St. Joseph, Missouri, to meet with ATF Special Agents Mark James and Gary Morefield in their undercover capacities as Trooper Jamison's sources for weapons. The meeting was held on the airfield tarmac next to a plane ostensibly used by the ATF agents in their illegal gun trade. During the meeting the agents showed Jonsson weapons from the list that he had previously discussed with Trooper Jamison.[3] When asked whether he had a specific purpose in mind for plastic explosives, Jonsson stated that he might need enough explosives and an appropriate detonator for a car bomb. Jonsson asked for an address or telephone number where he could contact Agents James and Morefield directly, but the agents told Jonsson he could only contact them through Trooper Jamison. After the meeting, Jonsson asked Trooper Jamison for a pager number so that he could contact Trooper Jamison without going through Knapp.

Trooper Jamison subsequently gave Jonsson his pager number and the address of a mailbox where he could contact Agent James directly. Sometime in mid-November 1991 Jonsson sent Agent James a letter requesting a meeting and paged Trooper Jamison to let him know. Agent James responded by a November 21, 1991, letter, and the meeting was then arranged by phone conversations between Jonsson and Trooper Jamison. The evening of December 5, 1991, Jonsson met Trooper Jamison at a prearranged location. Trooper Jamison drove Jonsson to a hotel where a videotaped meeting between Jonsson, Agent James and Agent Morefield took place. Shortly after exchanging pleasantries, Jonsson asked for a car bomb.[4] Jonsson proceeded to describe the type of car he

---

**3.** At some time during the meeting Agent James "sold" Trooper Jamison six military grenades in an effort to convince Jonsson that the agents were actually illegal arms merchants.

**4.** Agent James: What's been new with you?

Jonsson: Nothing very much really. Just, uh, I need something for the car because some of the guys coming around and I owe him some favor and I need something that be sort of remote control and be able to handle a car. I mean it really has to handle a car.
App. at 102.

wanted to destroy[5] and stated that he wanted the occupant killed.[6] Despite prodding from the agents, Jonsson did not indicate whether he wanted two or three bombs. Jonsson entered negotiations over price with the understanding that he would make a partial down payment and pay the remainder later or return the unused bombs. Jonsson negotiated the agents down from their initial asking price of $1,500 for three bombs to between $1,200 to $1,300 with the stipulation that he would make an advance payment of $600 at 12:00 p.m. the following day. Immediately following the meeting, the agents arrested Jonsson and he was subsequently convicted of attempting to buy a car bomb.

The necessary elements of an attempt are "(1) an intent to engage in criminal conduct, and (2) conduct constituting a 'substantial step' towards the commission of the substantive offense which strongly corroborates the actor's criminal intent." *United States v. Joyce*, 693 F.2d 838, 841 (8th Cir.1982). Jonsson does not contest his proven intent to violate the statute, but argues that the evidence at trial was insufficient to establish the requisite substantial step.

> A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime.... In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute.

*United States v. Mims*, 812 F.2d 1068, 1077 (8th Cir.1987) (quotations omitted). Whether conduct constitutes a substantial step de-pends on the particular circumstances of each case. *Joyce*, 693 F.2d at 841.

Jonsson claims that his conduct was nothing more than mere preparation because no money changed hands, no automobile specifications were provided, and no delivery date or number of devices was set. He relies on *United States v. Monholland*, 607 F.2d 1311 (10th Cir.1979), a case in which two defendants asked an undercover investigator on separate occasions about the price of dynamite. The undercover investigator, posing as a hit-man, showed both defendants a simulated stick of dynamite which he ostensibly used in his work. When the defendants asked the purchase price of the dynamite, the investigator responded that it was not for sale and the defendants did not press the matter further. The Tenth Circuit held that the defendants' "mere abstract talk" fell short of a substantial step to obtain an explosive device. *Id.* at 1317–20. The court explained that "[i]f the activity had proceeded to a further length, that is, if a tangible act which constituted proximate and tangible evidence of a real effort had emerged," the holding would have been different. *Id.* at 1317. Here, Jonsson went far beyond mere abstract talk during his several meetings and negotiations with the undercover agents. His analogy to *Monholland* is unconvincing.

According to Jonsson, verbal agreement alone is always insufficient to support an attempt conviction. Jonsson's Brief at 17–18 (citing *United States v. Delvecchio*, 816 F.2d 859 (2d Cir.1987)). In *Delvecchio*, the defendants met with government agents to discuss purchasing heroin, agreed upon the price and quantity of heroin, and arranged a meeting for the purchase the next day. When the defendants did not appear at the designated place for the purchase, the agents contacted them. One defendant said that he was "not comfortable" with the meeting, and the other

---

**5.** "[A] red, this sport car from Dodge, you know, this little sort [sic] car from Dodge, this new kind, it's not very old, it's something like 89, 90." App. at 110. There was evidence at trial that Jonsson's wife drives a red, late model Plymouth Laser. The government suggests that Jonsson had a motive to kill his wife because at the time of the meeting, Jonsson and his wife were involved in divorce proceedings. United States' Brief at 6; Transcript Vol. III at 78–79. Jonsson also described a Chevrolet pick-up truck that he indicated he might want to destroy. App. at 109.

**6.** Agent Morefield: Do you want, do you want the guy, person crippled, legs blown off, you want 'em kill, [sic] what do you want?
Jonsson: The car has to blow, I mean, the guy has to be killed.
App. at 105.

defendant suggested that the agents should leave the meeting site. The agents had no further contact with the defendants. The Second Circuit, noting that there was no evidence the defendants attempted to obtain money for the purchase or to go to the site of the proposed sale, held that "evidence of a verbal agreement alone, without more, is insufficient as a matter of law to support an attempt conviction." *Delvecchio*, 816 F.2d at 862.

■ Jonsson's reliance on *Delvecchio* is foreclosed by our opinion in *Mims*, 812 F.2d at 1076–79, in which we affirmed an attempt conviction based on conversations that did not even lead to a verbal agreement. The defendant in *Mims* was convicted of knowingly and intentionally using a telephone in an attempt to possess heroin with intent to distribute. The conviction was based on three phone conversations between the defendant and a government informant. The defendant offered the informant definite sums of money for heroin twice, but the informant declined. The informant ended the last conversation saying that he was not interested in dealing with the defendant. The defendant in *Mims* appealed his conviction arguing that his conversations did not establish a substantial step toward violation of the statute. We disagreed, holding that the defendant "had done all he could to obtain heroin short of getting [the informant] to agree to sell it to him." *Id.* at 1078. In reaching our decision we distinguished *Joyce*, a case analogous to *Delvecchio* in that it was the defendant, and not the government agent, who broke off negotiations before consummation of the illegal act. *See Mims*, 812 F.2d at 1078 (distinguishing *Joyce*, 693 F.2d 838). Our reading of *Delvecchio* leads us to conclude that the Second Circuit's holding was also influenced by that fact. We reject, as we must under *Mims*, Jonsson's invitation to create a *per se* insufficiency bar against attempt convictions based on verbal agreements alone.

Here, it is undisputed that Jonsson continued to negotiate with the government agents until his arrest prevented him from doing so. The government's audiotapes and videotapes establish that Jonsson met with undercover agents four times to discuss purchasing weapons and explosives. At three of these meetings Jonsson discussed explosives at length. The final meeting was called at Jonsson's written and oral request. Jonsson brought up the subject of car bombs at that meeting, described the cars he wanted to destroy, stated that he wanted to kill the occupants, negotiated the price, and agreed to deliver a down payment the next day. The fact that Jonsson had not settled all of the specifics for delivery does not detract from the fact that his conduct at the last meeting strongly corroborated his unwavering purpose to purchase a car bomb. We hold that given this evidence, a reasonable jury could find that Jonsson intended to possess an explosive device in violation of the statute and that he took a substantial step toward the commission of that crime.

## II. QUANTITY OF COCAINE FOR SENTENCING

Jonsson also challenges the district court's calculation of the quantity of cocaine involved in the conspiracy to which he pleaded guilty. Jonsson pleaded guilty to distributing at least five kilograms of cocaine, but claims that it was clear error for the district court to impose a sentence based on its finding that the conspiracy involved at least 20.2 kilograms of cocaine.

■ Jonsson's primary argument is based on the fact that one drug courier who testified against him did not have first-hand knowledge that one of two metal boxes he delivered from California to Kansas City on separate occasions actually contained cocaine. However, the courier testified that he had first-hand knowledge that the second box contained cocaine. Both deliveries were arranged by Jonsson in the same manner, pickup was made in the same place, the same type of box was used, and the boxes were delivered to the same storage bin. The only difference was that the courier looked inside the second box to find the cocaine, but he did not look inside the first. We cannot find

clear error in the district court's inference that the first box also contained cocaine.[7]

## III. CONCLUSION

For the reasons discussed above, the judgment of the district court is affirmed.

---

**7.** Our review of the record convinces us that the district court was, if anything, conservative in its calculation. The presentence report (PSR) and the testimony at sentencing established that Jonsson presided over a broad conspiracy to bring cocaine from California to the Kansas City area for distribution in Missouri, Iowa, and Nebraska. To avoid double counting, the court used only the cocaine that Jonsson brought into the Kansas City area, and did not consider the cocaine distributed by the conspirators (presumably the same cocaine). Either measure would have been appropriate, and Jonsson's co-conspirators admitted to distributing far more cocaine than the district court credited Jonsson with importing.