**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 23, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

CALVIN D. SINKS,

       Defendant-Appellant.

No. 05-2170

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 03-CR-777-BB)**

---

Vicki Mandell-King, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, District of Colorado and Wyoming, Denver, Colorado, for the Defendant-Appellant.

David N. Williams, Assistant U.S. Attorney (David C. Iglesias, with him on the brief), Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico, for the Plaintiff-Appellee

---

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **HARTZ**, Circuit Judge.

---

**LUCERO**, Circuit Judge.

---

Calvin Sinks appeals his convictions and sentence for knowingly possessing stolen explosive materials in violation of 18 U.S.C. §§ 842(h) and 844(a), and being a felon in possession of explosives in violation of 18 U.S.C. §§ 842(i) and 844(a). Following the Supreme Court's decision in United States v. Cotton, 535 U.S. 625, 631 (2002), we consider whether appellants challenging their indictments for failure to charge an offense waive their claims by failing to object before trial. We conclude they do not; however, such appellants receive only plain error review when they raise this argument for the first time on appeal. To the extent that United States v. Prentiss, 256 F.3d 971, 982 (10th Cir. 2001) (en banc), held otherwise, it has been overruled by Cotton. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **AFFIRM**.

**I**

On February 12, 2003, Sinks was stopped by Moriarty, New Mexico Police Officer Craig Davis for running a stop sign. He was driving a 1974 Ford flatbed pickup truck that Officer Davis described as "pretty-well beat up." Instead of pulling over to the shoulder of the road, Sinks stopped the truck in the center median. Sinks smelled of alcohol and was unable to provide Officer Davis with a driver's license, proof of insurance, or the vehicle's registration. When Officer Davis contacted his dispatch, he learned that the vehicle was not registered in Sinks' name, but had not been reported stolen. Sinks explained that he recently purchased the truck from "some ol' boy for a couple of hundred dollars," but he

did not have a bill of sale. After Sinks failed a consensual field sobriety test, Officer Davis arrested him for driving under the influence of alcohol and began inspecting the vehicle. Officer Davis could not find the keys to the ignition, but Sinks explained that he had hotwired the truck after losing the keys.

Although Sinks was not the vehicle's registered owner, and was unable to provide proof of insurance, a driver's license, the vehicle's registration, or the keys to the ignition, Officer Davis never suspected that the truck was stolen. He initiated the impound process and began filling out the impound inventory form. The passenger side of the truck's cab was piled high with clothing and sleeping bags, while various tools filled the bed of the truck. As the only officer on duty in Moriarty that night, Officer Davis did not attempt to catalogue every item in the vehicle. Instead, he summarized the contents as "clothing, sleeping bags, tools" on the inventory form. He also noted that the vehicle could be released from impound upon proof of ownership. Daniel Brick, an employee of Tavenner's Towing, arrived on the scene shortly thereafter and towed the truck to Tavenner's impound yard. Sinks was taken to the Moriarty police station for booking, then placed in the correctional holding facility in Estancia, New Mexico.

On March 6, 2003, after being released from custody, Sinks visited the impound yard. Although he had neither proof of ownership nor enough money to pay the impound fee, Brick allowed him to retrieve his personal belongings from the truck. As he watched Sinks sort through the clothing in the cab, it appeared to

- 3 -

Brick that Sinks was trying to cover up something in the vehicle. Sinks removed only one light jacket from the truck.

His suspicions piqued, Brick returned to the impound lot two days later and inspected the truck. While smoking a cigarette, Brick opened a box labeled "High Explosives - Dangerous" that he found buried under the pile of clothes and sleeping bags in the cab. Inside the box were 111 sticks of dynamite. Several of the sticks were taped together with wires protruding from the top of the bundle, while others had what appeared to Brick to be sparklers sticking out of them. Brick called the police, and the dynamite was safely removed by a bomb squad two days later.

The New Mexico Police eventually contacted the owner of the truck, Curt Wells. Wells informed police that the truck had been stolen from his ranch in Arizona, along with the tools, the clothing, and the dynamite. An employee of Wells had purchased the dynamite approximately ten years earlier in Winona, Arizona in order to blast post-holes. After completing the project, Wells stored the explosives in a locked steel box in a bunkhouse at his ranch.

Sinks was charged with knowingly possessing stolen explosive materials in violation of 18 U.S.C. §§ 842(h) and 844(a) ("Count One"), and being a felon in possession of explosives in violation of 18 U.S.C. §§ 842(i) and 844(a) ("Count Two"). Prior to trial, Sinks filed a motion in limine to exclude any testimony about an "improvised explosive device." The government responded that they

would not discuss any "improvised explosive device," but would attempt to introduce photographs showing the dynamite wrapped in tape with protruding wires, as well as testimony on the protective steps taken by the bomb squad. The district court ruled that it would admit the photographs, but reserved judgment on whether the bomb squad testimony would be admissible.

At trial, Michael Avilucea, the New Mexico State Police Bomb Commander, testified that he was called about the dynamite on March 8, 2003. As he explained the procedures he followed in his investigation, he began to describe what he saw in the dynamite box. He stated he "saw some electrical wiring and some other components, which led me to believe that possibly this case of dynamite–" at which point Sinks objected. The prosecutor instructed Avilucea not to mention explosive devices and the judge instructed the jury to disregard his partial answer. Avilucea then testified, over Sinks' objection, that a member of his crew wore a protective bomb suit, and that they "continued to check the vehicle for any other incendiary devices or other components or explosives." However, Avilucea admitted on cross-examination, after some prodding, that he did not find a detonator, which is required to ignite dynamite.

The next morning there was an unspecified threat at the courthouse, which the U.S. Marshals used as an opportunity to conduct a bomb-threat drill. As part of that drill, the marshals used dogs to search the building. The court instructed the jury that the search was merely a training exercise unrelated to the trial. Later

that day, as the prosecutor was attempting to introduce exhibits, he read "Exhibit 9-J, 9-K, 9-11" rather than "9-L." The court immediately corrected him.

Stephen Scheid, an Intelligence Research Specialist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") testified that he contacted the manufacturer of the dynamite by telephone. An employee of the company informed him that the dynamite had been manufactured in Missouri. Based on this comment, Scheid testified it was his expert opinion that the dynamite had crossed state lines.

A jury found Sinks guilty on both counts on November 26, 2003. The probation office, however, was not notified that Sinks was convicted until January 2005 and did not prepare his Presentence Report ("PSR") until March 2005. At the sentencing hearing, the district court and the prosecutor expressed regret for allowing Sinks to slip through the cracks. Nevertheless, the court imposed a sentence of 84 months' imprisonment for each count, with the sentences to run concurrently – in the middle of the Guidelines range.

**II**

Sinks advances four claims on appeal: (1) The district court abused its discretion by admitting evidence about the wiring of the dynamite and the use of a bomb squad; (2) The government failed to charge an interstate commerce element on Count One; (3) Scheid's testimony as to the location at which the dynamite was manufactured was inadmissible hearsay; and (4) His sentence was

unreasonable because the district court failed to consider the delay in the preparation of his PSR.[1]

**A**

We review a trial court's decision to admit evidence for abuse of discretion. United States v. Allen, 449 F.3d 1121, 1125 (10th Cir. 2006).  A court abuses its discretion when its decision is "arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment."  United States v. Weidner, 437 F.3d 1023, 1041 (10th Cir. 2005).  Admission of inadmissible evidence is harmless, however, unless the evidence "had a substantial influence on the jury's verdict in the context of the entire case, or leaves one in grave doubt whether it had such effect."  United States v. Mitchell, 113 F.3d 1528, 1532 (10th Cir. 1997) (quotation omitted).

Sinks argues that admitting the pictures of the taped and wired dynamite, Avilucea's testimony mentioning "other incendiary devices," and his discussion of the bomb squad's procedures constituted non-harmless error.  He contends that this information was only marginally relevant and led the jury to focus on, and overestimate, the danger of an explosion on a day when police dogs were being led around the courthouse.

---

[1] Sinks initially alleged that the evidence was insufficient to prove that the dynamite had traveled in interstate commerce, but abandoned this claim in his Reply Brief.

Evidence is relevant if it makes the existence of any fact of consequence more or less probable. Fed. R. Evid. 401. Relevant evidence is admissible unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

The photos were certainly relevant to show Sinks' possession of the dynamite. The bomb squad evidence was relevant to whether the material in the truck was an explosive within the meaning of the statute after Sinks refused to stipulate that dynamite was an explosive. The caution used by a trained explosives professional in examining the box shows that he believed the dynamite was an explosive. Moreover, this testimony provided the jury with a continuous chain of custody for the dynamite. The government could have overstepped its bounds by lingering on this evidence or attempting to paint Sinks as some sort of mad bomber, but it did not. Our review of the record indicates that this evidence had, at most, a minimal role in the trial and was well within the district court's discretion to admit.

The only arguably problematic testimony was Avilucea's use of the phrase "incendiary devices" on a day the court received an unspecified threat. Sinks was unlucky that the threat occurred the morning of his trial, but he has not carried his burden of demonstrating that this testimony affected his substantial rights. See Mitchell, 113 F.3d at 1532. Avilucea admitted on cross-examination that there were no explosive devices in the truck, limiting the prejudicial effects of his

testimony. Evidence showed that Sinks was arrested driving a stolen truck containing stolen dynamite. He was observed covering up the box of dynamite with clothing. In light of the substantial evidence against him, there is little reason to believe Avilucea's rhetorical flourish substantially influenced the jury's verdict.

**B**

18 U.S.C. § 842(h) forbids the possession of stolen explosives "which are moving as, which are part of, which constitute, or which have been shipped or transported in, interstate or foreign commerce, either before or after such materials were stolen." 18 U.S.C. § 842(h). Sinks argues that because the indictment did not charge, and the jury did not find, an interstate commerce element for Count One, his conviction must be set aside. The failure to charge an essential element of a crime violates the Fifth Amendment. Apprendi v. New Jersey, 530 U.S. 466 (2000). When a jury does not find an essential element of a crime, a defendant's conviction violates the Sixth Amendment. Blakely v. Washington, 542 U.S. 296 (2004).

The government argues that Sinks waived any indictment-based challenge by failing to object below. Certain motions alleging a defective indictment must be brought before trial. Fed. R. Crim. P. 12(b)(3). The Rules further provide that a "party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets." Fed. R. Crim. P. 12(e). There is an explicit exception to

the waiver rule for claims that the "indictment . . . fails to invoke the court's jurisdiction or fails to state an offense." Fed. R. Crim. P. 12(b)(3)(B).

Generally, the failure to allege an element of an offense is not a jurisdictional error. United States v. Cotton, 535 U.S. 625, 631 (2002). Our sibling circuits disagree on whether the failure to allege an interstate commerce element provides an exception to this general rule. Compare United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995) (holding that a district court lacked subject matter jurisdiction where a statute was subsequently held to be outside Congress' Commerce Clause power), and United States v. Spinner, 180 F.3d 514, 515-16 (3d Cir. 1999) (concluding that the failure to allege an interstate commerce element in an indictment for device fraud deprived the district court of jurisdiction), with Alikhani v. United States, 200 F.3d 732, 735 (11th Cir. 2000) ("An effect on interstate commerce may be required for Congress to have authority under the Commerce Clause to forbid certain conduct. But . . . that does not imply that a district court faced with an insufficient interstate-commerce nexus loses subject-matter jurisdiction of the case." (citation omitted)). In this Circuit, however, such defects are not a jurisdictional exception. United States v. Prentiss, 256 F.3d 971, 982 (10th Cir. 2001) (en banc) (holding that the failure to allege an element of a crime "is not jurisdictional in the sense that it affects a court's subject matter jurisdiction," and expressly criticizing Spinner) (quotation omitted).

Rather than asserting a jurisdictional defect, Sinks argues that by failing to charge the interstate commerce element of Count One, the indictment failed to charge an offense. In Prentiss we held that "a defendant cannot waive the right to challenge an indictment based upon its failure to charge an offense." 256 F.3d at 983. We were interpreting a prior version of Rule 12(b), which stated that claims challenging an indictment on the ground that it failed to charge an offense "shall be noticed by the court at any time during the pendency of the proceedings." Fed. R. Civ. P. 12(b)(2) (amended 2002). Citing this mandatory language, we went on to apply harmless error, rather than plain error review, despite the fact that the defendant had not objected at trial. Prentiss, 256 F.3d at 985 n.12.

Following Prentiss, Rule 12(b) was amended. Currently, Rule 12(b) provides that "at any time while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense." Fed. R. Civ. P. 12(b)(3). The Advisory Committee notes to the 2002 Amendments of Rule 12 state that the "changes are intended to be stylistic only, except as noted." The note specifically applicable to Rule 12(b) declares "[n]o change in practice is intended." Accordingly, the first rule of Prentiss survives: A defendant may challenge an indictment for its failure to charge an offense for the first time on appeal.

Prentiss' second holding, that harmless error review applies to such challenges, does not enjoy the same fate. Although we review Sinks' claim on the merits, we do so only for plain error. Such a result is required by the

- 11 -

Supreme Court's post-Prentiss decision in United States v. Cotton. 535 U.S. at 631 ("Freed from the view that indictment omissions deprive a court of jurisdiction, we proceed to apply the plain-error test of Federal Rule of Criminal Procedure 52(b) to respondents' forfeited claim."). To establish plain error, a defendant must show: "(1) an error, (2) that is plain, . . . (3) that affects substantial rights [and, (4)] seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Fabiano, 169 F.3d 1299, 1303 (10th Cir. 1999) (quotations omitted). Because Sinks is alleging constitutional error, we apply this test "less rigidly." United States v. Dazey, 403 F.3d 1147, 1174 (10th Cir. 2005).

The government concedes that the omission of the interstate commerce element was error, and was plain. However, when the evidence proving an element is "overwhelming" and "essentially uncontroverted," the failure to allege that element does not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." Cotton, 535 U.S. at 632-33 (quoting Johnson v. United States, 520 U.S. 461, 470 (1997)). In convicting Sinks on Count Two, the jury found that the dynamite had traveled in interstate commerce. Moreover, it was uncontroverted that the dynamite was stolen in Arizona and found in a vehicle driven by Sinks in New Mexico. Showing that an item crossed state lines is sufficient to show that it traveled in interstate commerce. See United States v. Snow, 82 F.3d 935, 940 (10th Cir. 1996) ("[W]hether the [item] in question was

transported for commercial or personal reasons is irrelevant; simply by crossing state lines the [item] traveled in interstate commerce."). Because the interstate commerce element was proven by overwhelming and essentially uncontroverted evidence, the failure to charge it does not rise to the level of plain error.

This same analysis applies to Sinks' Sixth Amendment claim. Indeed, the "overwhelming and essentially uncontroverted" test was developed in just this context and later extended to Fifth Amendment claims. See Cotton, 535 U.S. at 632-33; Johnson, 520 U.S. at 469-70. Failure by the jury to find an interstate commerce element on Count One similarly does not constitute plain error.

**C**

Sinks claims that ATF Agent Scheid's testimony was inadmissible hearsay. In particular, he argues that Scheid's telephone conversation with an unnamed dynamite manufacturing employee was too unreliable to form the basis of an expert opinion that the dynamite was manufactured in Missouri. Because Sinks did not object at trial, we review for plain error. See Fabiano, 169 F.3d at 1303.

The operative rule of evidence provides: "[I]f [the facts or data relied upon are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703. Scheid did not specifically state that he reasonably relied on the statements of dynamite manufacturing employees in the course of his investigations. Nor did

Sinks cross-examine Scheid on the basis of his opinion. However, an expert in tracing explosives might normally rely on the statements of dynamite manufacturing employees. We have previously upheld the introduction of expert testimony based on conversations with unnamed third parties. See United States v. McPhilomy, 270 F.3d 1302, 1313-14 (10th Cir. 2001) (upholding the introduction of a geologist's testimony on the value of certain stones based on conversations he had with several retailers). Without a fully developed record it is difficult to determine whether the admission of this testimony was error, highlighting the importance of objecting below.

In any event, we need not decide whether it was error because it clearly did not affect Sinks' substantial rights. The only relevance of this testimony was whether the dynamite had traveled in interstate commerce. As noted above, the fact that the dynamite was stolen in Arizona and found in New Mexico conclusively establishes that it did so. Even without this testimony the jury surely would have concluded that the dynamite had crossed state lines.

**D**

We review a sentence for reasonableness. United States v. Cage, 451 F.3d 585, 591 (10th Cir. 2006). A sentence that falls within a properly calculated Guidelines range is presumptively reasonable. Id.

After correctly determining a Guidelines range of 77 to 96 months, the district court noted it had a duty to consider the 18 U.S.C. § 3553(a) factors. It

stated, "[c]onsidering all those factors as well as the guidelines," Sinks deserved an 84-month sentence. Sinks contends that the district court erred in not considering the 16 months he spent in county jail awaiting the preparation of his PSR. Such consideration, he argues, would have promoted his "respect for the law," and would "provide just punishment." 18 U.S.C. § 3553(a)(2)(A).

The district court has discretion to attach varying degrees of import to the § 3553(a) factors. As we noted in Cage, a district court may act unreasonably by affording too much weight to a particular factor or set of factors. 451 F.3d at 595-96. In this case, however, Sinks has done nothing to overcome the presumption of reasonableness afforded his sentence. Although we too express regret that Sinks was all but forgotten for 16 months by the legal system designed to safeguard his rights, this fact alone does not render his sentence unreasonable.

**III**

For the reasons stated above, we **AFFIRM** Sinks' convictions and sentence.