FILED
United States Court of Appeals
Tenth Circuit

August 9, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

DEANDRE LARON WASHINGTON,
a/k/a Monster,

     Defendant-Appellant.

No. 10-7013

---

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:09-CR-00036-RAW-2)**

---

Robert A. Ridenour, Assistant Public Defender (Selim K. Fiagome, Assistant
Public Defender; Barry L. Derryberry, Research and Writing Specialist, with him
on the briefs), Office of the Federal Public Defender, Northern and Eastern
Districts of Oklahoma, Tulsa, Oklahoma, for Defendant-Appellant.

Ryan Roberts, Assistant United States Attorney (Mark F. Green, United States
Attorney; Linda A. Epperley, Assistant United States Attorney, with him on the
brief), Office of the United States Attorney, Eastern District of Oklahoma,
Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **O'BRIEN**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

Following a jury trial, Defendant-Appellant Deandre Laron Washington was convicted of one count of witness tampering, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2, and sentenced to 360 months in prison. The conviction stemmed from Mr. Washington's alleged part in a murder-for-hire scheme wherein he was hired by Ronald Irving to kill a local law enforcement officer prior to that officer testifying in a drug case against Mr. Irving.[1] Mr. Washington now appeals his conviction, raising four claims: (1) the indictment failed to charge a crime; (2) the indictment was duplicitous; (3) there was insufficient evidence introduced at trial to support his conviction; and (4) the district court abused its discretion in excluding the testimony of a defense witness who was present in the courtroom during trial in violation of the Rule of Sequestration. Exercising jurisdiction under 28 U.S.C. § 1291, we reject these challenges and affirm Mr. Washington's conviction.

**BACKGROUND**

In February 2009, Lieutenant Bryan Stark—the head of the Muskogee Police Department's Special Investigations Unit ("SIU")—received a handwritten note from a Muskogee County Jail inmate named Durrell Collins, which indicated

---

[1] Mr. Irving was also convicted of one count of witness tampering, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2, as well as one count of possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii), and was sentenced to 360 months in prison, followed by eight years of supervised release. In his related appeal, Mr. Irving—who challenges both of his convictions—raises several claims that are similar or identical to Mr. Washington's claims. *See United States v. Irving*, No. 10-7012.

that someone was trying to have him killed. The note read, in part: "I have someone in this jail trying to pay a guy I know out of Tulsa to have you killed because of the recent bust you did[.] I have the note he sent me askin [sic] me to set it up for 50,000." R., Vol. I, at 41 (Resp. in Opp'n to Mot. to Dismiss Indictment, filed Apr. 28, 2009) (internal quotation marks omitted). Mr. Collins was subsequently interviewed, and he told the law enforcement authorities that he had been contacted by Ronald Irving, a local drug dealer, about potentially arranging a "hit" on Lt. Stark. R., Vol. II, at 295–97 (Trial Tr., dated July 20–22, 2009). Mr. Irving, a frequent target of SIU investigations, had recently been incarcerated as a result of a narcotics sting orchestrated by Lt. Stark earlier that month (i.e., in February).

According to Mr. Collins, Mr. Irving first hatched this murder-for-hire plot in 2006, when he told a group of people at a party that he would pay $50,000 to anyone who would kill Lt. Stark.[2] At that time, Mr. Collins, who was also at the party, indicated that he knew someone—namely, Mr. Washington—who might be willing to do this, but nothing ever materialized following the 2006 conversation.

_____

[2] Nathan Simmons also testified at trial that Mr. Irving had announced at a 2006 house party in Eufala, Oklahoma, that he was willing to pay between $25,000 and $50,000 to have a cop (presumably Lt. Stark) killed. The impetus behind Mr. Irving's desire to eliminate Lt. Stark in 2006 was presumably the officer's involvement in a prior drug-related investigation and prosecution of Mr. Irving, which was based on a 2005 controlled buy of crack cocaine in which Mr. Irving took part.

3

However, while they were both in jail in February 2009, Mr. Irving sent a note to Mr. Collins suggesting that they move forward with the plan.

Mr. Collins then spoke directly to Mr. Irving regarding the plan through cell phones that had been smuggled into the jail. The cell phones were in the possession of Milton Warrior and Sean Warrior, cousin inmates who also were housed in the Muskogee County Jail. Sean Warrior was Mr. Irving's cell mate, and Milton Warrior was housed near Mr. Collins. "Milton Warrior called . . . Sean Warrior [on his cell phone] and got Ronald Irving on the phone[,] and [then Milton Warrior] called [Mr. Collins] into his cell [so he could] talk[] to Ron Irving." *Id.* at 303. According to Mr. Collins, Mr. Irving asked him if he was "still cool on—you know what I'm talking about on Starks [sic]?" *Id.* When Mr. Collins responded that he was on board, Mr. Irving asked him "what [he] needed to do to bond out [of jail]." *Id.* at 303–04. Mr. Collins then contacted law enforcement through the letter to Lt. Stark.

At the behest of federal investigators, Mr. Collins agreed to go along with Mr. Irving's plan. Shortly thereafter, he was bonded out of jail using money supplied by Mr. Irving. Once out, Mr. Collins contacted Mr. Washington. The two met for the first time on March 9, 2009, to discuss the details of the intended assassination. At that meeting, Mr. Collins was wearing an audio-visual recording devise provided by the FBI. With reference to Lt. Stark, Mr. Collins told Mr. Washington that "you got to lay the nigger down, be known." *Id.* at 49.

4

Mr. Washington responded: "I'm not going to sit there and wound the nigger, shit. Damn, there's 25,000 on the line. I'm going to square him up. Shit, straight lace." *Id.* at 50. Mr. Washington made several other statements reiterating his intent to kill Lt. Stark during the March 9 conversation, including that he was "[g]onna ride down there [i.e., to Muskogee] and . . . gonna boom him and come on back, nigga straight lace nigga. Shoot his ass up." Gov't Ex. 36 at 8 (Tr., Audio Recording of Mar. 9, 2009 Meeting).

Mr. Washington ultimately agreed to travel down to Muskogee with Mr. Collins on March 11, 2009, to kill Lt. Stark. The plan was for Mr. Collins to acquire a gun upon their arrival in Muskogee, and for Mr. Washington to do the actual shooting later that same day.[3] The FBI wired Mr. Collins with an audio-visual recording device prior to his departure for Muskogee and told him what to do when the arrest took place. As Mr. Collins and Mr. Washington were en route, they were stopped by the Oklahoma Highway Patrol as their vehicle crossed over the Arkansas River Bridge and entered into Muskogee. Mr. Washington was placed under arrest, and the ensuing search of his person revealed that he was

---

[3] On the day of the trip to Muskogee, Mr. Washington again reaffirmed his willingness to kill Lt. Stark. For example, speaking of Lt. Stark, Mr. Washington said: "Fuck im [sic]. I need this money anyway. . . . He don't know me, I don't know him, I don't give a fuck. It's done dealin'. Let's get this money . . . ." Gov't Ex. 43, at 1–2 (Tr., Audio Recording of Mar. 11, 2009 Meeting).

carrying a pair of surgical exam gloves in his shirt pocket. No weapon of any kind was recovered.

Mr. Washington was subsequently indicted, along with Mr. Irving, on one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and 2.[4] Specifically, the indictment charged that Mr. Washington "did attempt to kill Lieutenant Bryan Stark by conspiring to shoot him with the intent to prevent the attendance or testimony of Lieutenant Bryan Stark in federal court proceedings against [Mr. Irving]." R., Vol. I, at 24 (Indictment, filed Mar. 18, 2009).

Mr. Washington thereafter moved to dismiss the indictment, arguing, *inter alia*, that the charge was duplicitous. *See id.* at 30–31 (Mot. to Dismiss Indictment, filed Apr. 23, 2009) (arguing that the indictment "alleged two discrete

---

[4]     The witness-tampering statute reads, in pertinent part:

> (a)(1) Whoever kills or attempts to kill another person, with intent to—
>
> > (A) prevent the attendance or testimony of any person in an official proceeding;
> > . . . .
>
> shall be punished as provided for in paragraph (3).

18 U.S.C. § 1512(a)(1)(A).

As previously noted, the indictment also charged Mr. Irving—but not Mr. Washington—with one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii).

crimes[:] Conspiracy and Attempt, both under the rubric of Tampering with a Witness"; "[t]he infirmity is termed duplicity"). The government countered the claim of duplicity by suggesting that the use of the term "conspiring" in the indictment did not implicate the separate and discrete crime of conspiracy, but rather was used in an everyday, non-technical sense "to describe the manner in which both co-defendants attempted to kill Lt. Stark." *Id.* at 45 (Resp. in Opp'n to Mot. to Dismiss Indictment, filed Apr. 28, 2009). In particular, the government equated the term "conspiring" to "similar language such as 'scheming', 'planning', 'colluding', 'plotting' or 'negotiating.'" *Id.* In ruling on the motion, the district court admonished the government for using potentially confusing language, but nevertheless denied Mr. Washington's motion to dismiss the indictment, stating that it "d[id] not believe that the Government intended to charge the separate crime of conspiracy" in addition to the attempt charge. *Id.* at 51 (Order, filed May 6, 2009).

Mr. Washington and Mr. Irving were tried together. At trial, the government relied largely on the testimony of Lt. Stark, Mr. Collins, and Milton Warrior. Following the close of the government's case, Mr. Washington moved for dismissal of the charge against him, arguing that insufficient evidence existed to support a conviction because evidence of a defendant's "[m]ere intention to commit a . . . crime" was not sufficient to warrant a finding that he had committed a "substantial step" towards the completion of that crime, and

7

therefore he could not be found guilty of attempt. R., Vol. II, at 661–64. The district court denied the motion.

The defendant's case primarily rested on the testimony of Mr. Washington himself. Mr. Washington admitted being solicited by Mr. Collins to partake in a murder-for-hire plot. Mr. Washington claimed, though, that he never intended to kill Lt. Stark; he testified that his intention was to play along with the plan in order to get the up-front money, and then he planned to disappear. He acknowledged that he said numerous things that might invite a conclusion that he intended to kill Lt. Stark, but explained that he said them only to further the ruse. *See, e.g.*, *id.* at 771 ("I was just coming out with everything I had to convince [Mr. Collins] that I was serious about whatever I was trying to do."). Likewise, he equated the surgical gloves found on him to a "prop." *Id.* at 777. He also testified that both he and Mr. Collins had accused each other of "bullshitting" about the plot, thereby indicating—at least according to Mr. Washington—that neither party necessarily believed the other would go through with it. *Id.* at 775–77.

The defense also called Anthony Evans, the Assistant District Attorney for Tulsa County, who testified to the fact that Mr. Collins was cooperating with the police in return for a new charge and an application to revoke being dropped. Mr. Irving also testified, claiming that he was set up in the murder-for-hire plot, and that it was not his voice on the numerous recordings played to the jury.

8

Following the summary denial of Mr. Washington's renewed Rule 29 motion for judgment of acquittal at the close of all evidence, the case was submitted to the jury.  During deliberations, the jury expressed some confusion regarding the relationship between certain elements of the witness-tampering offense, as expressed in the indictment, and elements of the same offense, as embodied in the jury instructions.[5]  Mr. Washington, however, did not ask for a clarifying instruction, and none was ultimately given.

The jury returned a guilty verdict against both Mr. Washington and Mr. Irving, and the district court subsequently sentenced Mr. Washington to 360 months' imprisonment.  This timely appeal followed.

## DISCUSSION

As noted above, Mr. Washington raises four challenges to his conviction: (1) the indictment failed to charge a crime; (2) the indictment was duplicitous; (3)

---

[5]     Specifically, the jury submitted a note to the court that read: "[C]ould we please have clarification . . . between the terms conspiracy to attempt to kill listed on the indictment versus the listed section, quote, 'law, attempt to kill,' end quote?[]  Request explanation if they are the same."  Joint Resp. to Order of Feb. 2, 2011 (Feb. 16, 2011).  The parties stipulated to the fact that "the term 'listed section' [in the jury note] was meant to refer to the Court's jury instruction defining the law of attempt."  *Id.*; *see* R., Vol. I, at 153 (Jury Instructions, filed July 23, 2009) ("A defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime.  However, a defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.  Instead, in order to prove attempt, the government must prove beyond a reasonable doubt that (1) the defendant intended to commit the crime; and (2) the defendant took a substantial step towards commission of that crime.").

there was insufficient evidence produced at trial to support his conviction; and (4) the district court abused its discretion in excluding the testimony of a defense witness who was present in the courtroom during trial in violation of the Rule of Sequestration. Each claim is addressed in turn.

## I. Whether the Indictment Sufficiently Charged a Crime

Mr. Washington first argues that the interplay between "attempt" and "conspiring" in the indictment resulted in the government's failure to charge a cognizable federal offense. However, despite the fact that the indictment uses both the terms "conspiring" and "attempt to kill" in charging that Mr. Washington "did *attempt* to kill Lieutenant Bryan Stark by *conspiring* to shoot him with the intent to prevent [his] attendance or testimony in federal court proceeding against [Mr. Irving]," R., Vol. I, at 24 (emphasis added), we conclude that the indictment sufficiently charged a crime—namely, witness tampering in violation of 18 U.S.C. § 1512(a)(1)(A).

### A. Standard of Review

Both parties acknowledge that Mr. Washington failed to raise this issue before the district court. Mr. Washington argues that this claim is nevertheless subject to de novo review because it is "jurisdictional," and thus can be brought at any time. Aplt. Opening Br. at 9 (citing *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002)). The government, however, contends that Mr. Washington's "assertion that such a defect is jurisdictional and results in a void judgment . . . is

simply no longer the law after the United States Supreme Court decision in *United States v. Cotton*, 535 U.S. 625, 631 (2002)." Aplee. Br. at 14–15. Instead, according to the government, *Cotton* dictates that Mr. Washington's claim is not jurisdictional and, therefore, it should be reviewed only for plain error.

In *Cotton*, the Supreme Court rejected the proposition that all "indictment defects are 'jurisdictional.'" 535 U.S. at 631. Although the Court acknowledged that "defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court," it concluded that the petitioner's challenge in that case—a claim, raised for the first time on appeal, that the indictment was defective because it failed to charge a necessary element—was non-jurisdictional and thus subject only to plain-error review. *Id.* at 630–31. Importantly, the Court clarified that a mere error in an indictment is not sufficient to overcome forfeiture; rather, for that to happen, the error must implicate "the courts' statutory or constitutional *power* to adjudicate the case." *Id.* at 630 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998)) (internal quotation marks omitted). In other words, if a court ordinarily would consider an argument alleging an indictment error to be forfeited, it should only refrain from doing so when the alleged error implicates the court's power to resolve the case (i.e., when the alleged error is jurisdictional).

11

In *United States v. Sinks*, we considered the issue of "whether [post-*Cotton*] appellants challenging their indictments for failure to charge an offense waive their claims by failing to object before trial." 473 F.3d 1315, 1317 (10th Cir. 2007). We "conclude[d] [that] they do not." *Id.*[6] This conclusion was based largely upon Federal Rule of Criminal Procedure 12(b)(3), which states that "at any time while the case is pending, the court may hear a claim that the indictment or information fails . . . to state an offense." Fed. R. Crim. P. 12(b)(3)(B); *see also Sinks*, 473 F.3d at 1321 ("A defendant may challenge an indictment for its failure to charge an offense for the first time on appeal." (citing *United States v. Prentiss*, 256 F.3d 971, 983 (10th Cir. 2001) (en banc))). However, although we held that we would review a late-blooming claim that challenged an indictment for failure to charge an offense "on the merits," we also ruled that we would "do so only for plain error." *Id.* (citing *Cotton*, 535 U.S. at 631).[7]

_____

[6] *Sinks*, like *Cotton*, addressed a situation where the indictment allegedly omitted a necessary element of the offense. As Mr. Washington underscores, that is not the nature of his challenge here.

[7] *See also United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010) ("Because the appellant asserts that the indictment fails adequately to allege a necessary element of the offenses charged, [under Rule 12(b)(3),] we will assume . . . that her claim of error survives the government's waiver argument. Even so, her failure to raise the point below constitutes a forfeiture, which confines appellate review to plain error."); *United States v. Teh*, 535 F.3d 511, 515–16 (6th Cir. 2008) ("Teh's second argument . . . that his alleged offense cannot be prosecuted under § 545 . . . falls under the Rule 12(b)(3)(B) exception as a claim that the indictment failed to state an offense. . . . Still, because Teh did not challenge the indictment prior to this appeal, we review . . . his claim[] related to

(continued...)

12

As noted above, Mr. Washington asserts that his claim is not subject to plain-error review, reasoning that an indictment challenge "based on the theory that the charge lies outside the scope of the applicable penal statute . . . is jurisdictional and may be reviewed [de novo] on appeal."  Aplt. Opening Br. at 9. He distinguishes *Cotton* and *Sinks* by pointing out that they involved only non-jurisdictional challenges to an *omission* in the indictment, which is not the situation in this case.  *See Peter*, 310 F.3d at 714 (holding that an indictment charging "only . . . specific conduct that, as a matter of law, was outside the sweep of the charging statute" suffered from a *jurisdictional* defect that could be challenged at any time without incurring a more-rigorous standard of review). Even assuming, *arguendo*, that Mr. Washington correctly characterizes his claim as "jurisdictional," and that application of the rigorous plain-error standard is therefore inappropriate, we still conclude that Mr. Washington's challenge cannot succeed.[8]

---

[7](...continued)
the indictment for plain error." (citing *Cotton*, 535 U.S. at 631–32)).

[8]    Our assumption is a generous one.  The Supreme Court's decision in *Cotton* turned upon the evolving concept of "jurisdiction," with the Court concluding that the appropriate inquiry is whether the alleged defect in the indictment would strip the court of its statutory or constitutional *power* to hear the dispute.  *Cotton*, 535 U.S. at 630.  At bottom, Mr. Washington's claimed indictment defect is that "conspiring" behavior cannot serve as the predicate "substantial step" for an attempt-related offense (i.e., the witness-tampering offense here, which stems from an attempt to kill Lt. Stark).  That defect, however, is not one that seemingly goes to the court's *power* to adjudicate the

(continued...)

**B.     Analysis**

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Gama-Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)) (internal quotation marks omitted); *accord United States v. Barrett*, 496 F.3d 1079, 1092 (10th Cir. 2007); *see Russell v. United States*, 369 U.S. 749, 763–64 (1962) (noting that the two principal criteria by which the sufficiency of an indictment is measured are, "first, whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense[,] whether the record shows with accuracy to what extent he may plead a former acquittal or conviction" (quoting *Cochran & Sayre v. United States*, 157 U.S. 286, 290 (1895)) (internal quotation marks omitted)); *see also Hamling v. United States*, 418 U.S. 87, 117 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty

_____

[8](...continued)
charge; rather, it would appear to relate to the government's ability to *prove* the charge. Yet, as noted, we need not (and therefore do not) definitively determine whether Mr. Washington's indictment challenge is jurisdictional.

14

or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882))).

"The test of the validity of the indictment is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Gama-Bastidas*, 222 F.3d at 785 (quoting *United States v. Fitzgerald*, 89 F.3d 218, 222 (5th Cir. 1996)) (internal quotation marks omitted). Further, when evaluating an indictment's sufficiency, we employ "practical rather than technical considerations." *Id.* (quoting *Dashney*, 117 F.3d at 1205) (internal quotations marks omitted); *accord United States v. Avery*, 295 F.3d 1158, 1174 (10th Cir. 2002).

Moreover, when an appellant challenges an indictment for failure to state an offense for the first time on appeal, as is the case here, "the countervailing interest in judicial efficiency requires that tardily-challenged indictments be construed in favor of validity." *Gama-Bastidas*, 222 F.3d at 786 (quoting *United States v. Bullock*, 914 F.2d 1413, 1414 (10th Cir. 1990)) (internal quotation marks omitted); *see id.* ("[A]fter a verdict or plea of guilty, every intendment must be indulged in support of the indictment . . . ." (alteration in original) (quoting *Clay v. United States*, 326 F.2d 196, 198 (10th Cir. 1963)) (internal quotations marks omitted)); *see also United States v. Willis*, 102 F.3d 1078, 1081 (10th Cir. 1996) ("Although we generally review the sufficiency of an indictment de novo, when a

15

defendant fails to raise a timely challenge, 'we will liberally construe an indictment in favor of validity.'" (quoting *United States v. Bolton*, 68 F.3d 396, 400 (10th Cir. 1995))). In particular, "[i]f a defendant does not challenge an indictment until after a verdict or guilty plea, and if he 'does not assert prejudice, that is, if he had notice of the crime of which he stood accused, the indictment is to be read with *maximum liberality*.'" *Gama-Bastidas*, 222 F.3d at 786 (emphasis added) (quoting *Fitzgerald*, 89 F.3d at 221).

In this instance, Mr. Washington does not assert that he was prejudiced by the alleged deficiency in the indictment. That is, he has not argued that he had no notice of the charge against him—namely, witness tampering through his attempted murder of Lt. Stark, in violation of 18 U.S.C. § 1512(a)(1)(A). And we find nothing in the record indicating that Mr. Washington received insufficient notice of the charge against him.[9] Accordingly, in line with our precedent, we

---

[9] For example, in addition to the notice given by the indictment itself, the jury instructions clearly set out the elements of the witness-tampering offense. Under the heading "COUNT TWO"—"STATUTE DEFINING OFFENSE CHARGED," the instructions recite the charging statute, 18 U.S.C. § 1512(a)(1)(A), and state that "[§] 1512(a)(1)(A) provides in pertinent part: Whoever kills or attempts to kill another person, with intent to . . . prevent the attendance or testimony of any person in an official proceeding . . . shall be guilty of an offense against the United States." R., Vol. I, at 150.

The next instruction, which defines the "essential elements" of Count 2, states:

TAMPERING WITH A WITNESS
18 U.S.C. § 1512(a)(1)(A)

(continued...)

16

> The defendants are each charged in Count Two of the Indictment with tampering with a witness in violation of 18 [U.S.C. §] 1512(a)(1)(A).
>
> In order for a defendant to be found guilty of the charge in Count Two of the Indictment, the government must prove beyond a reasonable doubt each element of the crime. These elements are:
>
> *First*: the defendant attempted to kill Bryan Stark; and
>
> *Second*: the defendant acted with the intent to prevent the attendance or testimony of Bryan Stark in an official proceeding.

*Id.* at 151. The instructions also defined the law of attempt. *See, e.g.*, *id.* at 153 ("[I]n order to prove attempt, the government must prove beyond a reasonable doubt that (1) the defendant intended to commit the crime; and that (2) the defendant took a substantial step towards commission of that crime.").

Mr. Washington does not argue on appeal that the jury instructions improperly set forth the elements of the witness-tampering offense. Nor did he voice surprise before the district court concerning the specific language used in the two elements noted above, or otherwise object to this language. This lends support to the conclusion that Mr. Washington was accurately apprised of the elements of the witness-tampering offense when he appeared before the district court, and that he was able to fashion his defense accordingly.

To be sure, Mr. Washington did lodge a notable objection that urged the court to instruct the jury on certain offense elements. However, he did so on the ground that the jury should have been instructed on the elements of the *separate* crime of conspiracy. *See* R., Vol. II, at 958–59. The impetus for this objection was Mr. Washington's view that the indictment charged more than one crime in a single count—i.e., it was duplicitous. *See* R., Vol. I, at 28 ("Conspiracy and attempt . . . are discrete charges, with their own elements. The jumbled mix of separate crimes cobbled together in a few lines [of the indictment] is duplicitous."). Mr. Washington filed no objection, however, on the distinct ground that the witness-tampering instructions failed to apprise the jury of the

(continued...)

17

will read the indictment with maximum liberality and construe it in favor of validity. Under this approach, "[w]e will find the indictment sufficient unless it is so defective that by *any reasonable construction*, it fails to charge the offense for which the defendant is convicted." *Avery*, 295 F.3d at 1174 (emphasis added) (quoting *Gama-Bastidas*, 222 F.3d at 786) (internal quotation marks omitted). Following "this liberal construction rule, an indictment challenged for the first time post-verdict [e.g., on appeal] may be found sufficient, even though that indictment would have been found wanting had it been challenged pre-verdict." *Id.*

Viewing Mr. Washington's indictment with maximum liberality, and construing it in favor of validity, we conclude that the indictment adequately pleaded the witness-tampering offense. First, the indictment sufficiently "sets forth the elements of the offense charged." *Barrett*, 496 F.3d at 1092. The body of the indictment cites the statute, 18 U.S.C. § 1512(a)(1)(A), and recites the two elements of the witness-tampering offense: (1) Mr. Washington "*attempt[ed] to kill* Lieutenant Bryan Stark," and (2) his attempt "to shoot [Lt. Stark]" was done

---

[9](...continued)
elements of *that* crime—even if there was supposedly *another* crime (i.e., conspiracy) that warranted further instruction. Accordingly, we find no indication—either in Mr. Washington's arguments on appeal or in the record below—that Mr. Washington was prejudiced due to lack of notice by the alleged deficiency in the indictment.

"with the *intent to prevent [his] attendance or testimony . . . in federal court proceedings* against [Mr. Irving]."  R., Vol. I, at 24 (emphasis added).[10]

Furthermore, the caption of the indictment recites the statute, 18 U.S.C. § 1512(a)(1)(A), and indicates that the indictment charges "Tampering With A Witness."  *Id.*  Although "[w]e recognize that this court and others have held on occasion that the caption is not a controlling part of the indictment," we also have concluded that, in analyzing whether an offense was sufficiently charged, we can "us[e] the caption to supplement and clarify the charging intent of the grand jury that is expressed in the body of the indictment."  *Gama-Bastidas*, 222 F.3d at 787.

In addition, as discussed above, Mr. Washington does not dispute that the indictment put him "on fair notice of the charge[] against which he must defend."  *Barrett*, 496 F.3d at 1092.  Lastly, we have no problem concluding that the indictment "enable[d] [Mr. Washington] to assert a double jeopardy defense."  *Id.*  He makes no argument to the contrary, "nor could such an argument fairly be

---

[10]    As noted above, the witness-tampering statute reads, in pertinent part:

> (a)(1) Whoever kills or *attempts to kill* another person, *with intent to—*
>
> > (A) *prevent the attendance or testimony of any person in an official proceeding*;
> > . . . .
>
> shall be punished as provided for in paragraph (3).

18 U.S.C. § 1512(a)(1)(A) (emphasis added).

19

made." *United States v. Boston*, 718 F.2d 1511, 1515 (10th Cir. 1983).  This is especially true because "the entire record, not just the indictment, may be referred to in order to protect against double jeopardy if a subsequent prosecution should occur."  *Id.*; *accord United States v. Apodaca*, 843 F.2d 421, 430 n.3 (10th Cir. 1988).  In this regard, we note, for example, that the jury instructions clearly charged Mr. Washington with attempting to kill Lt. Stark to preclude his attendance at Mr. Irving's proceedings.  *See* R., Vol. I, at 150–53; *see also supra* note 9 (explaining that the jury instructions provided notice as to the nature of the witness-tampering offense).  Accordingly, viewing the indictment with maximum liberality and construing it in favor of validity, we hold that the indictment was sufficient to charge the offense for which Mr. Washington was convicted—*viz.*, witness tampering through the attempted murder of Lt. Stark.

## II.    Whether the Indictment Was Duplicitous

Mr. Washington next contends that, even if the indictment does sufficiently charge a crime, it is nevertheless duplicitous because it impermissibly charged two crimes in a single count—that is, conspiracy *and* attempt.  The government, on the other hand, argues that the indictment only "charg[ed] one crime—attempting to kill a police officer by conspiring to shoot him and kill him in order to prevent him from testifying."  Aplee. Br. at 22.  We conclude that the indictment did not charge Mr. Washington with more than one offense under the same count; consequently, the indictment was not duplicitous.

20

### A. Standard of Review

We review a claim that an indictment is duplicitous de novo. *United States v. Trammell*, 133 F.3d 1343, 1354 (10th Cir. 1998).

### B. Analysis

An indictment is duplicitous if it "charges the defendant with two or more separate offenses in the same count." *United States v. Haber*, 251 F.3d 881, 888 (10th Cir. 2001) (quoting *Trammell*, 133 F.3d at 1354) (internal quotation marks omitted). When this occurs, it "present[s] a danger that the jury may convict a defendant although not reaching a unanimous agreement on precisely which charge is the basis for the conviction," *United States v. Schneider*, 594 F.3d 1219, 1228 (10th Cir. 2010), which would run afoul of "[t]he Sixth Amendment guarantee[] . . . to a unanimous jury verdict," *United States v. Linn*, 31 F.3d 987, 991 (10th Cir. 1994). We also have identified both the fact that "[a] defendant may be prejudiced in a subsequent double jeopardy defense," and that "[a] court may have difficulty determining the admissibility of evidence," as other dangers that may stem from a duplicitous indictment. *Trammell*, 133 F.3d at 1354.

Mr. Washington claims that a single count of his indictment implicated the crimes of attempt *and* conspiracy, which he notes "are discrete charges, with their own set of elements." Aplt. Opening Br. at 13; *see United States v. Savaiano*, 843 F.2d 1280, 1292 (10th Cir. 1988) (indicating that conspiracy and attempt are distinct crimes requiring proof of unique elements (citing *Blockburger v. United*

21

*States*, 284 U.S. 299, 304 (1932))).  Mr. Washington first raised this issue in his motion to dismiss the indictment, and he now suggests that a principal danger of duplicitous indictments (i.e., a jury verdict of guilt without unanimous juror agreement regarding the crime) was realized here.  This was supposedly evidenced by the jury's request for "clarification . . . between the terms conspiracy to attempt to kill listed on the indictment versus the listed section, quote, 'law, attempt to kill.'"  Joint Resp. to Order of Feb. 2, 2011; *see supra* note 5.[11]

As support for his duplicitous-indictment argument, Mr. Washington relies heavily upon the Third Circuit's decision in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975).  There, the government charged a Hobbs Act violation, *see* 18 U.S.C. § 1951(a), alleging in a single count that the defendants did "unlawfully and willfully conspire *and* attempt to obstruct, delay and affect commerce" by virtue of their extortion plot.  *Id.* at 115 (emphasis added).  The Third Circuit agreed with the defendants that the indictment was duplicitous:

> The Hobbs Act proscribes a number of separate offenses: (1) robbery; (2) extortion; (3) attempted robbery or extortion; and (4) conspiracy to commit robbery or extortion.  Each such offense also requires the federal jurisdictional element of obstruction, delay, or effect on interstate commerce.  The indictment charged two such offenses; conspiracy to extort and attempt to extort.  Since both were improperly charged in a single count, the defendants' pre-trial motions that the indictment be dismissed, or

---

[11]     As noted earlier, however, Mr. Washington did not seek a clarifying instruction—despite the jury's question.  Accordingly, none was given.

> that the government be required to elect, should have been granted.

*Id.* at 116 (footnote omitted).

*Starks*, however, may be readily distinguished from the present case. The indictment in *Starks* charged the defendants in a single count with two distinct offenses prosecutable under 18 U.S.C. § 1951(a) of the Hobbs Act. Specifically, it alleged that the defendants both "conspire[d] *and* attempt[ed] to obstruct, delay and affect commerce." *Starks*, 515 F.2d at 115 (emphasis added). In contrast, even though Mr. Washington's indictment referenced conspiring behavior in offering factual details concerning the defendants' conduct, its legally operative language charged only a single offense, prosecutable under 18 U.S.C. § 1512(a)(1)(A) of the witness-tampering statute—specifically, tampering with a witness through an "attempt to kill" him. R., Vol. I, at 24. Mr. Washington's astigmatic focus on the conspiracy-related language of the indictment simply does not advance his cause. That language cannot be reasonably read as incorporating the formal elements of a conspiracy offense.[12] In sum, we hold that the

---

[12] The distinction between this case and *Starks* can be better understood by considering the contrast between conspiracy under the witness-tampering statute and conspiracy under the Hobbs Act. Under the witness-tampering statute, conspiracy is a separate prosecutable offense, but it must be prosecuted under a *different* provision of the statute than the one at issue here; in other words, conspiracy to tamper with a witness must be charged pursuant to 18 U.S.C. § 1512(k), not 18 U.S.C. § 1512(a)(1)(A). In contrast, under the Hobbs Act, conspiracy and attempt appear as distinct crimes within the same statutory provision—18 U.S.C. § 1951(a). Accordingly, it would be understandable for a

(continued...)

indictment charged a single offense—witness tampering; consequently, it is not duplicitous.

## III.  Sufficiency of the Evidence to Support the Witness Tampering Verdict

Mr. Washington next argues that there was insufficient evidence to support his witness-tampering conviction.  More specifically, he contends that the evidence did not sufficiently demonstrate that he "perform[ed] a substantial step that was 'an appreciable fragment' of murder," and that "[h]is actions went no further than 'devising or arranging the means or measures necessary for the commission of the offense.'"  Aplt. Opening Br. at 18.  On the other hand, the government asserts that "[a] fair review of the evidence . . . reveals multiple, substantial steps taken toward commission of the crime, from phone calls and meetings to travel and sterile gloves."  Aplee. Br. at 29.  We conclude that the evidence presented at trial was sufficient to sustain Mr. Washington's conviction.

### A.  Standard of Review

This circuit reviews sufficiency-of-the-evidence claims de novo, "ask[ing] whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and

---

[12](...continued)
court (as the Third Circuit did in *Starks*) to conclude in a Hobbs Act prosecution brought under § 1951(a) that, when the government uses both the terms conspiracy and attempt in a single count, it has improperly charged two separate offenses in the *same* count—i.e., that the count is duplicitous.  However, in light of the difference between conspiracy under the witness-tampering statute and conspiracy under the Hobbs Act provisions, such reasoning is inapposite here.

24

drawing reasonable inferences therefrom." *United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). In so doing, we "will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury," *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007) (quoting *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005)) (internal quotation marks omitted), nor will we "examin[e] the evidence in bits and pieces," *United States v. Gallant*, 537 F.3d 1202, 1222–23 (10th Cir. 2008) (quoting *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004)) (internal quotations omitted). Rather, "we evaluate the sufficiency of the evidence by 'considering the collective inferences to be drawn from the evidence as a whole.'" *Nelson*, 383 F.3d at 1229 (quoting *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997)).

## B. Analysis

In order to establish Mr. Washington's guilt of witness tampering under 18 U.S.C. § 1512(a)(1)(A), "the government was required to prove beyond a reasonable doubt (1) that [he] knowingly attempted to kill [Lt. Stark] and (2) that he did so with the intent to prevent [Lt. Stark's] attendance or testimony at an official proceeding." *United States v. Rose*, 362 F.3d 1059, 1067 (8th Cir. 2004); *accord* 18 U.S.C. § 1512(a)(1)(A). An attempt requires both (1) an "intent to commit the substantive offense," and (2) the "commission of an act which constitutes a substantial step towards commission of the substantive offense." *Vigil*, 523 F.3d at 1267 (quoting *United States v. Smith*, 264 F.3d 1012, 1015

25

(10th Cir. 2001)) (internal quotation marks omitted).  Whether a defendant's actions amount to an "attempt," and, in particular, whether his actions qualify as a "substantial step," is a highly fact-specific inquiry.  *See United States v. DeSantiago-Flores*, 107 F.3d 1472, 1479 (10th Cir. 1997) ("The dividing line between preparation and attempt is not clear and depends to a high degree on the surrounding factual circumstances."), *overruled on other grounds by United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997); *see also United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996) ("Whether conduct represents a substantial step depends on the 'surrounding factual circumstances' and, therefore, such determinations are necessarily fact specific.").

"A substantial step must be something more than mere preparation," *Vigil*, 523 F.3d at 1267, "yet may be less than the last act necessary before the actual commission of the substantive crime," *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980); *see also United States v. Prichard*, 781 F.2d 179, 182 (10th Cir. 1986) ("[M]odern 'attempt' law allows criminal liability to attach at some point prior to the last proximate act.").  The fact that further, major steps remain "before the crime can be completed does not preclude a finding that the steps already undertaken are substantial." *Savaiano*, 843 F.2d at 1297 (emphasis omitted) (citation omitted) (internal quotation marks omitted).  Instead, a "substantial step" is appropriately found where the defendant undertook "an appreciable fragment of a crime . . .  of such substantiality that, unless frustrated,

26

the crime would have occurred." *Smith*, 264 F.3d at 1016 (quoting *DeSantiago-Flores*, 107 F.3d at 1479) (internal quotation marks omitted). The act or acts "must be strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Bunney*, 705 F.2d 378, 381 (10th Cir. 1983) (quoting *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974)) (internal quotation marks omitted).

On appeal, Mr. Washington contends that he "did not perform a substantial step that was 'an appreciable fragment' of murder." Aplt. Opening Br. at 18. More specifically, he claims that the only steps he took—supposedly, only conspiring with Mr. Collins to kill Lt. Stark and traveling with him to Muskogee—were "preparatory act[s]" that were insufficient to warrant a conviction for attempt. *Id.*

In arguing that his actions were merely preparatory, Mr. Washington relies heavily on *United States v. Monholland*, 607 F.2d 1311 (10th Cir. 1979). There, this court found insufficient evidence to support a conviction for attempting to receive an explosive in interstate commerce where there "was nothing more than preliminary discussion[s]" about the purchase of some dynamite. *Id.* at 1317. The defendants in that case had asked the government informant what the price of a box of dynamite would be, and had later, and more specifically, asked the informant "what [he] would . . . take for" the dynamite that he possessed. *Id.* A price was never indicated, as the informant told them the dynamite was not for

27

sale, and there was no suggestion that the defendants actually had the money to pay for the explosives. *Id.* The panel concluded, therefore, that this evidence, "consisting as it does of *mere abstract talk*," could not show a substantial step towards completion of the crime. *Id.* at 1318 (emphasis added). The court reasoned that

> mere acts of preparation, not proximately leading to the consummation of the intended crime, will not suffice to establish an attempt to commit it, especially when made at a distance from the place where the substantive offense is to be committed, for there must be some act moving directly towards the commission of the offense after the preparations are made.

*Id.* (citation omitted) (internal quotation marks omitted).

"As courts invariably and correctly state, the question of when preparation ends and attempt begins is exceedingly difficult." *Prichard*, 781 F.2d at 181; *see also United States v. Coplon*, 185 F.2d 629, 633 (2d Cir. 1950) (Hand, C.J.) ("The decisions are too numerous to cite and would not help much anyway, for there is, and obviously can be, no definite line [between preparation and attempt] . . . ."). In *Monholland*, although we held that "mere abstract talk" was not a substantial step, we also observed that "[i]f the activity had proceeded to a further length, that is, if a *tangible act* which constituted proximate and tangible evidence of a real effort had emerged, the government's [charge] would be more tenable." *Id.* at 1317 (emphasis added).

28

The government contends that this presents just such a case. Specifically, it notes that the "talk" in this case was also accompanied by the fact that Mr. Washington was arrested while traveling to Muskogee, purportedly to perform the hit, with latex surgical gloves on his person. Mr. Washington, in contrast, downplays the significance of the trip, noting that he and Mr. Collins "were [not] driving to a location where Stark might have been." Aplt. Opening Br. at 18. Claiming that "[t]he destination of the trip to Muskogee was to obtain the $25,000 which was to be paid up-front," Mr. Washington suggests that his traveling to Muskogee was merely a "preparatory act" because "[w]ithout the money in hand there clearly would not be a murder." *Id.* As he sees it, "[w]ith no gun, no up-front money, and no knowledge of Stark's location, [he] was several vital steps away from the commission of murder when he was stopped outside of Muskogee on the Arkansas River bridge." *Id.* at 18–19.

We conclude that there was sufficient evidence before the jury to support Mr. Washington's conviction. The fact, as he puts it, that he was "several vital steps away" from murdering Lt. Stark is hardly dispositive. As we have observed, the defendant need not be "on the verge of committing the specific act that constitutes the crime" to warrant a conviction for attempt. *Prichard*, 781 F.2d at 182. Rather, the government may prevail if, viewing the evidence in light most favorable to it and drawing all reasonable inferences therefrom, a reasonable jury could have concluded beyond a reasonable doubt that Mr. Washington

29

committed an act that constituted an "appreciable fragment of [the] crime" that was of "such substantiality that, unless frustrated, the crime would have occurred." *Smith*, 264 F.3d at 1016 (quoting *DeSantiago-Flores*, 107 F.3d at 1479) (internal quotation marks omitted).

In this case—although several steps did remain before the planned murder would take place—we conclude that Mr. Washington's presence in a vehicle headed towards Muskogee (a city in which he had no apparent business beyond the planned hit), with Mr. Collins (the person who had facilitated the murder-for-hire agreement), on *the very day* that the hit was planned to take place (i.e., in close temporal proximity to the planned crime), combined with the extensive conversations he had with Mr. Collins about the planned killing, provide a very powerful indication that, but for the interference of the police, the planned criminal act would have come to fruition.

Indeed, a number of courts have considered traveling to a location as part of a planned crime important in their "substantial step" inquiry, and we see no reason why we should not do the same under these facts. *See, e.g.*, *United States v. Myers*, 575 F.3d 801, 809 (8th Cir. 2009) (finding that defendant took a substantial step towards committing the crime of enticing a minor to engage in sexual activities when he arranged to meet the minor at a certain time and place and then traveled to the designated meeting location); *United States v. August*, 835 F.2d 76, 78 (5th Cir. 1987) ("Certainly a reasonable jury could believe . . .

30

that one who travels over three hundred miles to a pre-arranged rendezvous, bearing the agreed cash consideration for a cocaine buy, has taken a substantial step toward possessing the contraband.").

Furthermore, as the government suggests, it is significant that Mr. Washington was arrested with a pair of latex surgical gloves on his person. Mr. Washington admitted at trial that gloves are often used to hide fingerprints. Although this is not necessarily the type of evidence which, *on its own*, indicates a substantial step, it does, when taken in context, provide additional, corroborating evidence of Mr. Washington's intent to commit the crime. *See* Model Penal Code § 5.01(2)(e) (stating that "possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances" is "strongly corroborative of the actor's criminal purpose").

In light of the foregoing, we reject any suggestion that the evidence only established that Mr. Washington engaged in "mere abstract talk," *Monholland*, 607 F.2d at 1311, regarding the killing of Lt. Stark, or that the jury's verdict rested on virtually nothing more than evidence of conspiring behavior, without an adequate substantial step. We are confident that there was sufficient evidence before the jury to support Mr. Washington's witness-tampering conviction.

31

**IV.** **Whether the District Court Abused Its Discretion In Excluding Terry Warrior's Testimony**

Mr. Washington's final claim is that the district court abused its discretion when it refused to allow defense witness Terry Warrior—the mother of Sean Warrior—to testify. At the outset of the trial, the district court invoked the Rule of Sequestration, ordering that "anyone who is in the courtroom, except the parties, who [is] going to be a witness in the case or potentially be a witness must excuse themselves now." R., Vol. II, at 40. Despite the court's warnings that potential witnesses should leave the courtroom, Ms. Warrior remained, watching her son, Sean Warrior, testify for the defense.[13] On cross-examination, the government tried to discredit Sean Warrior's testimony by suggesting that it may have been the product of witness intimidation. In particular, the government asked whether his mother, Ms. Warrior, had been threatened at gunpoint during a home invasion roughly a month prior to trial, implying that he may have been coerced into testifying favorably for the defense. *See id.* at 720–21 (questioning Mr. Warrior about "a break-in at [his] mom's house" during which "[s]he had a

---

[13] As discussed above, Sean Warrior and Milton Warrior—who are cousins—possessed the cell phones used by Mr. Irving and Mr. Collins to communicate while in prison in February 2009. Milton testified on behalf of the government. Sean, on the other hand, testified favorably on behalf of the defense. More specifically, Sean testified regarding the communications that occurred between Mr. Collins and Mr. Irving by phone in the jail cell—indicating that Mr. Irving "d[id]n't even know" Mr. Collins, and that Mr. Irving hung up the phone on Mr. Collins when he tried to contact him—and about Milton's supposedly dishonest character and possible motive for testifying on behalf of the government. R., Vol. II, at 683–95.

32

gun put to her," and asking if "[s]omebody said something about testifying" in Mr. Irving and Mr. Washington's upcoming trial). Although Sean acknowledged that "somebody ran in [his mother's home] with a gun[,] . . . made her lay [sic] down, . . . and asked her for some money and . . . took a little jewelry and . . . a laptop and ran out," he denied any knowledge of the intruders mentioning his testimony or the defendant's name or nickname to his mother during the occurrence. *Id.* at 722. Rather, he suggested that the district court "ask her [directly]. She is right there." *Id.* at 722.

The defense, who had previously been unaware of Ms. Warrior or her presence in the courtroom that day, subsequently sought to have her testify to the fact that no threat was made during the robbery, which would serve to undermine the government's suggestion that Sean Warrior's testimony was coerced. Noting that Ms. Warrior was present during her son's testimony—thereby violating the court's sequestration order—the district court judge excluded Ms. Warrior as a witness, stating that this was not "a situation where [he] w[ould] make an exception for a witness who is in the courtroom . . . in violation of the Rule of Sequestration." *Id.* at 760. The defense then made an offer of proof, indicating that Ms. Warrior "would deny on the stand that there were any threats made concerning testifying . . . [and] deny that there were any statements made regarding [Mr. Washington]" during the break in. *Id.* at 760–61.

Later during trial, the defense again requested to call Ms. Warrior.  Defense

counsel reiterated that he "had no idea who the lady was sitting back there," and

noted, moreover, the he was unaware of the government's eventual line of

questioning regarding Ms. Warrior, making it impossible for him to know that

Ms. Warrior's presence would present any concerns.  *Id.* at 826.  The district

court again excluded Ms. Warrior's testimony "because she was present for the

testimony [of Sean] and that's a violation of the Rule of Sequestration."  *Id.* at

825–26.  In denying the defense's request, the court acknowledged that its ruling

"may perhaps require [counsel] to be too prescient," but simply stated: "that's the

way it goes.  Sorry."  *Id.* at 826.  Mr. Washington now challenges the exclusion of

Ms. Warrior's testimony.

## A.    Standard of Review

"We review for abuse of discretion a district court's sequestration

decisions."  *United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1296

(10th Cir. 2010).

## B.    Analysis

Federal Rule of Evidence 615 authorizes a district court to "order witnesses

excluded so that they cannot hear the testimony of other witnesses."  Fed. R.

Evid. 615.[14]  When a violation of the Rule of Sequestration occurs, however, "this

---

[14]    We have observed that "[t]he exclusion of witnesses from the courtroom during trial is a time-honored practice designed to prevent the shaping

(continued...)

34

alone does not render the witness'[s] testimony inadmissible." *United States v. Buchanan*, 787 F.2d 477, 485 (10th Cir. 1986); *accord Holder v. United States*, 150 U.S. 91, 92 (1893) ("If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified."); 4 Weinstein's Fed. Evid. § 615.07[2][d] ("Most courts hold that violating a proper exclusion order is not in itself sufficient to warrant excluding the testimony of the witness who violated the rule."). Rather, when a sequestration order is disregarded, "it is within the district court's discretion to admit or exclude the witness's testimony." *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 980 (10th Cir. 1996); *see also United States v. McVeigh*, 106 F.3d 325, 330 n.3 (10th Cir. 1997) (stating that the district court has discretion to enforce the violation of a sequestration order "by any of a variety of sanctions, only one of which is exclusion of evidence" (quoting *United States v. Kane*, 646 F.2d 4, 8 (1st Cir. 1981)) (internal quotation marks omitted)); *United States v. Gibson*, 675 F.2d 825, 835 (6th Cir. 1982) ("The decision whether a witness who fails to obey a sequestration order may subsequently take the stand is undoubtedly one for the trial court."). However, "[e]xclusion of a

_____

[14](...continued)
of testimony by hearing what other witnesses say." *United States v. Johnston*, 578 F.2d 1352, 1355 (10th Cir. 1978); *see also United States v. Rugiero*, 20 F.3d 1387, 1392 (6th Cir. 1994) ("The statutory purpose of the rule requiring sequestration of witnesses is to preclude coaching or the influencing of a witness'[s] testimony by another witness.").

witness'[s] testimony is 'an extreme remedy' that 'impinges upon the right to present a defense,' and thus should be employed sparingly." *United States v. Smith*, 441 F.3d 254, 263 (4th Cir. 2006) (quoting *United States v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000) (en banc)); *see also Holder*, 150 U.S. at 92 ("[T]he weight of authority is that [a witness] cannot be excluded on that ground [i.e., violation of a sequestration order], merely.").

Some of our sister circuits have indicated that exclusion is appropriate primarily where the witness has remained in court with the "consent, connivance, procurement or knowledge" of the party seeking his testimony, *Gibson*, 675 F.2d at 836 (quoting *United States v. Kiliyan*, 456 F.2d 555, 560 (8th Cir. 1972)) (internal quotation marks omitted)—i.e., where such a party has knowingly or intentionally effectuated a violation of the order. *See, e.g.*, *Kiliyan*, 456 F.2d at 560–61; *Braswell v. Wainwright*, 463 F.2d 1148, 1156 (5th Cir. 1972); *Taylor v. United States*, 388 F.2d 786, 788 (9th Cir. 1967); *United States v. Schaefer*, 299 F.2d 625, 631 (7th Cir. 1962); *cf. United States v. Diaz*, 248 F.3d 1065, 1104 (11th Cir. 2001) ("[W]here counsel or the witness *violate the rule intentionally*, the court may strike testimony already given or disallow further testimony." (emphasis added)).

Although we may not have formally adopted this rule, our precedent indicates that a party's culpability in the violation of a sequestration order is a significant factor in determining whether admission or exclusion of the witness is

36

the proper remedy for the violation. *See Johnston*, 578 F.2d at 1355 (holding that the district court did not abuse its discretion in *allowing* testimony by a witness who had violated a sequestration order, in part, because "[t]here [was] no indication at all in the record that Government counsel intentionally permitted disregard of the rule"); *United States v. Sluder*, 457 F.2d 703, 711–12 (10th Cir. 1972) (finding no abuse of discretion in the district court's decision to *allow* testimony of a witness who had violated a sequestration order when the prosecutor "did not know that Martinez was to be a witness while the latter was in the courtroom").

Furthermore, our circuit has made clear that "[p]robable prejudice should be shown for such exclusion to occur." *Burks*, 81 F.3d at 980 (alteration in original) (quoting *Holder*, 150 U.S. at 92) (internal quotation marks omitted); *accord Buchanan*, 787 F.2d at 485 ("Probable prejudice should be shown for such exclusion [based on a violation of a sequestration order] to occur."); *see also* 4 Weinstein's Fed. Evid. § 615.07[2][d] ("Most courts . . . require at least a showing of probable prejudice resulting from the violation [of a sequestration order] before authorizing exclusion of the witness's testimony.").

"Under these standards," Mr. Washington argues, "the trial court lacked a basis for exclusion of the testimony" because "[d]efense counsel did not know about the incident at Terry Warrior's house, which occurred just a month before trial," and "did not even know who Terry Warrior was." Aplt. Opening Br. at 24.

37

Mr. Washington suggests that the district court abused its discretion in not "consider[ing] the lesser remedies"—including a contempt citation or a comment to the jury by reason of the violation, *see Holder*, 150 U.S. at 92—and in not "tak[ing] appropriate pause before imposing 'the most serious sanction of excluding testimony.'" Aplt. Opening Br. at 24 (quoting *United States v. Samuels*, 493 F.3d 1187, 1191 (10th Cir. 2007)). The government argues, in contrast, only that Mr. Washington "has provided no reason to disturb th[e] District Court's exclusion of testimony in this case or to view the ruling as anything out of the ordinary for the Eastern District of Oklahoma." Aplee. Br. at 34.

Although Ms. Warrior was unquestionably present for the testimony of her son, and, as the district court noted, this was the only testimony that would have had any relevance to her own statements, this does not in-and-of-itself warrant exclusion. *See, e.g.*, *Holder*, 150 U.S. at 92. In this case, the record is devoid of any of the factors noted above that justify exclusion of a witness. There are no indicia of "consent, connivance, procurement or knowledge" of Ms. Warrior's violation by defense counsel, *Gibson*, 675 F.2d at 836, and the district court never paused to conduct even a semblance of a "probable prejudice" inquiry," *Burks*, 81 F.3d at 980 (alteration omitted). Consequently, we agree with Mr. Washington that the district court abused its discretion by "mechanistically exclud[ing] the testimony upon finding a violation of the Rule." Aplt. Opening Br. at 24.

38

This does not end our inquiry, however. Even where we have determined that the district court abused its discretion, we still may not grant relief if the district court's error was harmless. *See Burks*, 81 F.3d at 980–81. The government contends that, "[g]iven the overwhelming remainder of the evidence against [Mr.] Washington, including his own voice on tape and his capture on the Arkansas [R]iver bridge, Defendant cannot show that he was prejudiced even if the District Court was too harsh." Aplee. Br. at 34. Mr. Washington counters by claiming that the exclusion was not harmless because the government's use of "rapid-fire, compound question[ing]" in its cross-examination of Sean Warrior was aimed at "portray[ing] [him] as changing his testimony in favor of the defendants," the threat to his mother was "supplied [as] a motive for doing so," and the exclusion of Ms. Warrior prevented defense counsel from repelling this attack. Aplt. Opening Br. at 24; *see also id.* at 25 ("Exclusion of Terry Warrior's testimony that no threat was made . . . deprived the Defendant of the opportunity to counter what the government had established."). Furthermore, Mr. Washington claims that the court's decision "was not in the service of truth-seeking," as "the Defendant offered evidence that the statements were not made, while the government stood on no evidence—only insinuation." *Id.* at 25.

In determining whether a particular error was harmless, "the court should not consider the error in isolation, but rather should consider it in the context of the entire record." 28 Moore's Federal Practice – Criminal § 652.03 (2010). "A

39

non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless 'unless a substantial right of [a] party is affected.'" *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (alteration in original) (quoting Fed. R. Evid. 103(a)). An error affecting a substantial right of a party is an error that "had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). The burden is on the government to establish the harmlessness of any error. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

There is little on this record to suggest that the district court's erroneous decision to exclude Ms. Warrior affected the substantial rights of Mr. Washington. As the government pointed out, extensive and damning evidence existed of Mr. Washington's intent to kill Lt. Stark and of his attempt to do so, whether it be in the form of the recorded conversations he had with Mr. Collins, his presence in the car with Mr. Collins en route to Muskogee, or the testimony of Mr. Collins himself. Even if Ms. Warrior had been allowed to testify, she would have only discredited the government's coercion theory regarding Sean Warrior's testimony. However, she would not have been able to overcome the other inconsistencies that the government had already identified in his testimony—including, for instance, the inconsistencies in the total number of conversations that he claimed transpired between Mr. Collins and Mr. Irving in

40

jail, and whether or not he had listened to them at all. That is, Sean Warrior's credibility with the jury was in doubt regardless of the government's coercion theory, and Ms. Warrior's testimony would not have been able to fully rehabilitate it. Given the strong evidence of guilt that exists in this instance, and the inconsistencies in Sean Warrior's testimony that had otherwise been highlighted by the government, we conclude that the district court's error was harmless.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Mr. Washington's conviction.